[Civ. No. 9257. First Appellate District, Division One.—July 3, 1935.]

LEILA MAE WALTON, Administratrix, etc., Respondent, v. SOUTHERN PACIFIC COMPANY (a Corporation), Appellant.

Dunne & Dunne and Arthur B. Dunne for Appellant.

Clifton Hildebrand, Louis E. Goodman, Louis H. Brownstone, Goodman, Bachrack & Brownstone, Erwin P. Werner and Thos. F. McCue for Respondent.

McNUTT, J., *pro tem.*—Plaintiff, the administratrix of Walton, deceased, sued in her own behalf and in that of her two minor children for the wrongful death of the husband and father, resulting from injuries sustained by him as an employee of defendant, a common carrier in interstate transportation. Defendant has appealed from the judgment of $12,500 entered upon the verdict in her favor.

·Intermediate the institution of the instant action and the occurrence of the accident Walton had sued in the federal

court for damages for the injuries sustained by him in the accident of March 25, 1930. This case was tried with a jury, the Honorable Frank H. Kerrigan, Judge of said Court, presiding. His complaint was in two counts: 1. Under the Federal Employers' Liability Act; 2. Under Boiler Inspection Act. The defendant, by answer, made certain denials and pleaded affirmative defenses.

At the conclusion of plaintiff's presentation—defendant offering no evidence—it moved for a directed verdict.

Appellant herein contends that the record shows said motion to have been granted by the trial court and sustained by affirmance of the judgment, October 14, 1931, in *Walton* v. *Southern Pacific Co.*, 53 Fed. (2d) 63 (C. C. A. 9). Respondent urges, however, that the record reveals no more than the granting of a nonsuit, and, hence, that there would appear to have been no meritorious adjudication.

At page 599a, reporter's transcript, as a part of the judgment in the Circuit Court of Appeals, we find: ''At the close of the appellant's case, the appellee moved for a directed verdict. The motion was granted by the trial court, and 'a judgment of nonsuit' was rendered accordingly on February 25, 1931. On that day the plaintiff—appellant—was allowed 30 days in which 'to settle and allow a bill of exceptions'.'' It appears that in the trial of the instant case, appellant herein offered to put in evidence the record of the trial in the federal case. However, the record herein does not disclose what it may have contained other than the quoted excerpt from the appellate court opinion, which cannot be read as more than a judgment of nonsuit, which is no bar to a subsequent action on the same case. (*Mohn* v. *Tingley*, 191 Cal. 470-478 [217 Pac. 733].)

Furthermore, the causes are not identical as to measure of damage, the instant differing from the original case. (*Michigan Cent. R. Co.* v. *Vreeland*, 227 U. S. 59 [33 Sup. Ct. 192, 57 L. Ed. 417, Ann. Cas. 1914C, 176]; *Louisville & N. Ry. Co.* v. *Holloway*, 246 U. S. 535 [38 Sup. Ct. 379, 62 L. Ed. 867].)

The complaint in the suit at bar was in three counts, in each of which plaintiff sues as administratrix of the estate of Walton, deceased, and the parties for whose benefit she sues and the defendant, respectively, are identical. Count num-

ber one proceeds upon the Federal Employers' Liability Act, and alleges that decedent and defendant were both engaged in interstate commerce at the time of the accident in question, and then sets forth with particularity the negligence of the defendant due to which the decedent was injured. Count number two, grounded upon a violation of the Federal Boiler Inspection Act, alleges with particularity the violations of such act as it is alleged occasioned the injury. Count number three as amended, purports to charge violation of the Federal Employer's Liability Act, alleging negligence in more general terms, with a view to invoking the doctrine of *res ipsa loquitur.*

The answer admits the death as alleged, admits that as to some of its activities defendant was a common carrier by railroad engaged in interstate commerce, but denies that it was so engaged in respect to the matters referred to in the complaint; denies that the decedent was at any time or place as pleaded engaged in interstate commerce; admits the matter of his death; admits the control of the engine through its agents, alleging decedent to have been one of them. Other material allegations as to the effects or causality between them and the accident and the death are denied.

Motions for nonsuit and for directed verdict were severally made as to each count, and as to the theory upon which such count proceeded. These motions were severally denied.

Appellant assigns error in the court's refusal to submit certain special issues; this lay within the trial court's discretion and no abuse appears.

The Federal Employers' Liability Act is a negligence statute and fastens upon a railroad engaged in interstate commerce liability in damages to a person injured while employed by a railroad in such commerce, and gives, in the event of his death, an action for the benefit of the surviving husband or wife and children of such employee, where such injury or death results in whole or in part from the negligence of the carrier, or its agents, or by reason of any defect or insufficiency due to its negligence in, among other things, its engine, appliances and machinery. It deals as well with the effect of contributory negligence, assumption of risk and limitation of action.

The Boiler Inspection Act (like the Safety Appliance Act) contains no provision dealing with actions for death, contributory negligence or limitation of actions, nor does it require, in order that its violation may be invoked, that the employee be engaged in interstate commerce.

■ Causes of actions may be brought jointly under the Employers' Liability Act and the Boiler Inspection Act, and it has been held that such actions are governed by federal laws. (*Kidd* v. *Chicago etc. Ry.*, 310 Mo. 1 [274 S. W. 1079]; *certiorari* denied, 269 U. S. 582 [46 Sup. Ct. 119, 70 L. Ed. 424]; *Gerow* v. *Seaboard Airline Ry.*, 189 N. C. 813 [128 S. E. 345]; *certiorari* denied, 269 U. S. 584 [46 Sup. Ct. 121, 70 L. Ed. 425].)

At 4 o'clock in the afternoon, March 25, 1930, the decedent James C. Walton, received injuries which resulted in his death when an engine which he as an employee of appellant was supplying with fuel at its roundhouse, at its yard in Colton, California, unexpectedly backed, throwing him from his position on the tender and against the cab. Walton was a hostler's assistant. The engine 2604 had been spotted by Lord, the hostler, at the oil column to take in fuel. Lord left the cab to supply the engine with water. At that time Walton saw one Roxie climb into the cab and take the fireman's seat. Roxie was an engine watchman. Walton, as his duty required, watched the oil flowing into the tender so as to prevent it running over. While so engaged the engine suddenly ran backwards as Walton testified on his first trial, 14 feet, and as Lord admitted, 10 feet. Walton was thrown against the oil column, back against the engine of the cab and injured. After a brief period of unconsciousness he was taken to the hospital and died as a result of the injuries.

The witness German, for plaintiff, testified that at the time of the accident he was employed in said yard, was one of the crew that took 2604 out at 11 o'clock P. M. of the day of the accident; that the first work the engine did that night was to switch a train known as 98, the Phoenix Manifest, which was bound for Tucson, El Paso and Phoenix, Arizona; that he switched cars that were marked to go through to Phoenix; that the next switching job performed by the engine was to break up and switch a train known as the "Pick-up", bound for Yuma, Arizona, and points east; that about 3

o'clock in the afternoon of the day of the injury a witness, on coming by the roundhouse, had happened to notice on the bulletin board that 2604 was assigned for 11 P. M.; that the purpose of the switching crew is making up and breaking trains.

Counsel stipulated that Colton is a station on appellant's line and also a part of the main line running out of Los Angeles and across the Arizona borders; that it is a switch yard wholly within this state; that in the normal course of business switching movements are made of both interstate and intrastate character; that 2604 was assigned to such yard to be used indiscriminately in interstate and intrastate commerce; that on the day of the accident on the morning shift which had begun at 7 A. M. and was to finish at 3 o'clock but, due to a little overtime, finished a few minutes later, 2604 had handled indiscriminately interstate and intrastate switching operations, and, further, subject to appellant's objection that it was irrelevant, incompetent and immaterial, that from 11 P. M. on March 25, 1930, until the end of that shift, which would be 7 A. M., March 26, 2604 was again engaged in similar, that is to say, in switching operations, indiscriminately interstate and intrastate.

Witness Schwartz testified that 2604 was used indiscriminately to switch cars coming into the state and cars going to points beyond the state and as well cars coming from points beyond the state. "It was used for general yard work."

"Q. Then that would include switching cars both interstate and intrastate in character? A. It would."

On the following morning, 25th to 26th, it switched a car eastbound as far as Chicago; that engines of either trains are spotted for oil and water at the column in question and are inspected and refilled on track number two. It was further stipulated that at times the track in question is used as a highway for interstate commerce.

Lord, the hostler, testified that he was a Southern Pacific fireman; that Walton had several jobs, part of his duty being to assist the witness; that the witness was in charge of 2604 when Walton was hurt; that the witness, among others, excluding Walton, had authority to move engines, but before he spotted the engine and left the cab he shut off the throttle; that when the engine backed eight to ten feet no bell or whistle

was sounded, and that he left the engine in charge of no one authorized to move it; that when the engine was so left the throttle was left so completely closed that no steam could get from the boiler to the cylinders and no steam was coming from the boilers into the cylinders. This testimony of Lord, plaintiff's witness, is the only direct testimony in the case bearing upon the question as to whether steam could get from the boiler into the cylinders.

The testimony which Walton had given in the district court case was read over objections of appellant. He was first employed by the Southern Pacific Company August 15, 1929, as an extra about the Colton roundhouse doing whatever the foreman directed. About January 1st he was informed that he would be hostler's helper, in which capacity he worked until injured between 3:45 and 4 P. M. March 25, 1930. His duties were to take engines around the Wye, fuel and water them and fill lubricators. On March 25th he was preparing 2604 for the next shift it went out on. Lord was hostler in charge. Switching crew had used 2604 in switching operations that day. Walton got on front of engine, gave Lord signal to back, he spotted it at the sand dome, witness put in sand, then walked back across the top of engine and cab to the oil tank, gave him signal to back and spot for oil and water. When Lord spotted the engine he was in engineer's seat pulling throttle. When spotted, witness pulled oil beam over, opened manhole, put telescope into manhole and turned on the oil. Lord left nobody in charge of engine. Witness turned around and saw that Roxie climbed into cab and sat in fireman's seat. While oil was being taken the engine moved back cutting off the oil supply, oil beam struck witness in the chest and knocked him across the cab. He was unconscious for about a minute and on coming to looked about, Lord was gone, he remembered no more. And that on March 22, 1930, and while the boiler was closed tight, 2604 moved backwards; that if throttle had been shut off and the same and other parts were in proper condition and working order, the reverser on center engine would not have moved.

Respondent (brief, p. 7) asserts that the record shows 2604 was actually assigned to this interstate switching purpose at 3 o'clock P. M. of the day Walton was injured, and that this engine did interstate switching on that next assignment. This statement is not justified. The testimony of the witness

German goes no further than does the stipulation of the parties, namely: That the engine was to go out at 11 P. M. in connection with switching operations.

One Loftus, a discharged fireman, testified that in March, 1930, and for nearly twelve years, he had been an S. P. fireman, a hostler, and had worked in the roundhouse before becoming fireman. He knew engine 2604. In the early part of 1930, including March, he had worked on the extra board, did not witness the accident; had worked on 2604 the last time two or three days before Walton was hurt, and before that in March as fireman and hostler. Within a few days before March 25th, the engine had a leaky throttle; that it had a leaky throttle after the accident; had a tendency to walk away of its own accord, to move, cylinders filled up with steam which leaked down into the pistons, causing them to work the driver; the steam having been exhausted through leakage, the engine would stop; imagines it walked twelve to fifteen feet; had seen it move of its own accord several times; moved because cylinder filled up with steam due to leaky throttle; condition of engine not different after the accident; if brakes were set they would hold it.

On cross-examination witness said he could not possibly be mistaken about these events; that the only times when he saw 2604 move of its own accord was when he was in the yard and as a fireman was working on it; that he worked two or three days before March 25th; that he does not believe that the last time he worked was March 7th. He said he was familiar with the main line register which (starting March 9th) was shown him. On that day he worked on 2616. It shows 2604 worked next day, and that he had signed the register which does not show that he worked on 2604. On March 9th he signed up on 2616, again on March 11th, again on March 16th. On March 9th, fireman on 2604 was Ward, the same on 10th. The book received in evidence shows no work for Loftus on 2604 from March 7th until late in April. Witness examines the book, does not find therein that he worked on 2604. He says at times he saw it move; contends that he was a fireman when he saw it move. His signature shows that he worked as fireman on 2681 on March 26th, 27th, 28th, 29th and on 30th without engine number, and says that from the 26th to the 30th he was working on 2681 and did not work on 2604 after the accident within two or three days.

A statement that had been signed by him September 27, 1930, was exhibited to him. (Exhibit 5.) It shows, among other things: "I do not recall any defects on this engine. I do not remember any time that this engine moved off of its own accord. I never heard of this engine running away. I never had any trouble with this engine as to a defective throttle. I never heard of this engine or any other engine moving off of its own accord, . . . have no recollection that this engine had a leaky throttle while I was working on it."

Many witnesses testified for defendant as to condition of the engine in question, the result of which shows that it had always been inspected before the accident, that its throttle had never leaked, that the inspection was made after the accident and no leaky throttle existed.

■ Was the deceased employee when injured engaged in interstate transportation or in work so closely related to such transportation as to be practically a part of it? He was not on the engine when it did any switching work on its night shift, because of his injuries. 2604 was not a regularly assigned interstate road engine. It was used indiscriminately for switching purposes of either character, and it was to be used that night in shifting cars in intrastate and interstate movements. It was being fueled preparatory to such general use when he was injured. Does the fact that the first car that it switched that night was one in an interstate movement give color to the purpose for which the engine was being prepared for use as one looking to interstate transportation; or, since it is a stipulated fact that the engine was being prepared for general use, either interstate, intrastate, or both, is its first actual later movement wholly adventitious? So far as this record is concerned it is circumstantial and accidental that the first car that it moved in switching operations that night was an interstate car.

If 2604 was not by predesignation an interstate engine it would not become such from the mere fact that the first car it switched that night was an interstate car; hence fueling engine was not employment in interstate transportation.

It follows that if the engine was not to go into interstate transportation because it was being prepared for general use, the inquiry is ended and there was no room for the operation of the Employers' Liability Act.

*Minneapolis & St. Paul R. R. Co.* v. *Winters,* 242 U. S. 353, [37 Sup. Ct. 170, 61 L. Ed. 358, Ann. Cas. 1918B, 54], pre-

sented a case in which plaintiff was injured while making repairs to an engine. The engine "had been used in the hauling of freight trains over defendant's line. . . which freight trains hauled, both intrastate and interstate commerce, . . . and it was so used after the plaintiff's injury". It had pulled a freight train into the town where plaintiff was injured three days before the accident, and pulled one out of the same place on the day of the accident. The court said:

"That is all that we have, and is not sufficient to bring the case under the act. This is not like the matter of repairs upon a road permanently devoted to commerce among the states. An engine, as such, is not permanently devoted to any kind of traffic, and it does not appear that this engine was destined especially to anything more definite than such business as it might be needed for. It was not interrupted in an interstate haul to be repaired and go on. It simply had finished some interstate business and had not yet begun upon any other. Its next work, so far as appears, might be interstate or confined to Iowa, as it should happen. At the moment it was not engaged in either. Its character as an instrument of commerce depended on its employment at the time, not upon remote probabilities or upon accidental later events."

In *Onley* v. *Lehigh V. R. Co.*, 36 Fed. (2d) 705 (C. C. A. 2d), *certiorari* denied, 281 U. S. 743 [50 Sup. Ct. 349, 74 L. Ed. 1156], a brakeman working on a switching crew was injured after having oiled an engine, while testing a fire hose. The defense was that plaintiff was not engaged in interstate commerce. It was conceded that plaintiff and the engine had been engaged during the morning in interstate switching part of the time and intrastate switching part of the time, and that but for the accident he would have been working in the afternoon doing such switching as might have been required. "The future is barren of assistance, for he was not employed in preparing for some definite movement, so that his work was a necessary incident of it, and became of like character with it; and nothing is known but that the plaintiff, and we may assume the engine, would have, in the ordinary course of events, done such switching as would have been required. We do not know what would have been required, except that it might have been wholly interstate switching, wholly intrastate, or partly both."

The cases cited in the briefs are myriad, so that an extensive analysis of them would be impossible. However, the Supreme Court of this state, in the case of *Mappin* v. *Atchison, Topeka etc. Ry. Co.,* 198 Cal. 733 [247 Pac. 911, 49 A. L. R. 1330] (not cited in any briefs), lays down the principles by which the character of commerce in which the employee was engaged is to be ascertained. The United States Supreme Court denied *certiorari.* The facts of the Mappin case differ in essential particulars from those in the instant case. In the former, a member of the switching crew was injured during the switching operation; while here no switching operation was in progress. In the Mappin case, the switching crew was in the act of making and breaking up trains in the company's yard at San Francisco. The immediate train comprised of thirteen cars, three of which not only originated as to transportation outside of California, but one of them, though empty, had actually begun its homeward movement in conformity with the rules and customs of carriers, while others were in the course of movement to designated places to receive freight for points outside the state when the injuries occurred. Speaking of one of the cars the court said: "It had been selected by the yard master for such loading and had been designated for that purpose. Its designation was to 'Block 6', in the freight house of the defendant, which was the place from which freight destined to Arizona points was to be loaded upon cars. . . . It was in the course of movement to its thus designated place for its thus predesigned purpose when the injuries to Mappin occurred." The court then distinguishes *Chicago Junction Ry. Co.* v. *Industrial Board,* 277 Ill. 512 [115 N. E. 647], relied upon by appellant railroad as indicating that the employment of Mappin was not in interstate transportation. In said case deceased employee was one of the switching crew moving some fifteen empties from the shops to the storage tracks in the carrier's freight yards when he was injured in the course of such removal. Eleven of these cars after the accident were taken to the storage tracks, reiced and on the same day moved by another crew to loading tracks and were filled with interstate freight. The opinion of the court expressly recites (says our Supreme Court): That up to the time of the accident there had been no specific designation given as to where any particular car would ultimately go, and the court for that reason held that the cars

were not, at the time of decedent's injury, engaged in inter-state commerce, and the court in that case says: "It has been held that if the object of a switching movement is the placing of an empty car in a position to receive a load to be carried out of the state the car is engaged in moving interstate commerce from the moment the switching movement begins." (Citing cases.)

The record here shows merely that the night shift involved the same character of work as the finished day shift, namely: Whatever switching work presented itself, intra or interstate, and for aught that appears, the fact that the first car that it switched that night was interstate in character, is purely a circumstance, and it was not work predesignated or predetermined while the fueling operation was in progress.

There are many cases cited in the briefs which deal with injuries received while the employees were working upon property dedicated to interstate commerce such as roadbeds and bridges, which, of course, have no application here as the yard switch engine is not, in and of itself, dedicated to any kind of commerce until specific assignment occurs.

It is therefore concluded that at the time of the injuries to the decedent, he was not employed in interstate transportation or work so closely connected therewith as to become a part thereof.

Notwithstanding *Van Buskirk* v. *Erie R. R. Co.* (1922, C. C. A., 3d Cir., 279 Fed. 622), relied upon by respondent in petition for rehearing to establish that Walton when injured was engaged in interstate transportation, we believe that the following cases support the contrary view: *Chicago & E. I. R. Co.* v. *Industrial Commission of Illinois,* 284 U. S. 296 [52 Sup. Ct. 151, 76 L. Ed. 304, 77 A. L. R. 1367]; *Shanks* v. *Delaware etc. R. R. Co.,* 239 U. S. 556 [36 Sup. Ct. 188, 60 L. Ed. 436, L. R. A. 1916C, 797]; *Chicago, B. & Q. R. R. Co.* v. *Harrington,* 241 U. S. 177 [36 Sup. Ct. 517, 60 L. Ed. 941]; *Chicago & N. W. Ry. Co.* v. *Bolle,* 284 U. S. 74 [52 Sup. Ct. 59, 76 L. Ed. 173].

■ The contention of appellant that the second cause of action is barred by the statute of limitations is untenable. Walton received his injury on March 25, 1930; he died January 5, 1932. The present action was commenced February 16, 1932, within 45 days after his death. The Boiler Inspection Act is silent as to the time within which an action may

be brought, and, therefore, under the authorities, about to be referred to, the state law, section 340, subdivision 3, of the Code of Civil Procedure, applies, which provides that the action be brought within one year after the death.

*Moore* v. *Chesapeake & O. Ry. Co.*, 291 U. S. 205 [54 Sup. Ct. 402, 78 L. Ed. 755] (Feb. 5, 1934). In this case action was brought in two counts: 1. Under Federal Employers' Liability Act, and 2. On the theory that plaintiff was not engaged in interstate commerce under Safety Appliance Acts and a Kentucky statute. In discussing this subject, the court said:

"In relation to injuries received in that state in intrastate commerce, aside from the particular bearing of the Federal Safety Appliance Acts, the liability of respondent was determined by the laws of Kentucky. . . . Questions arising in actions in state courts to recover for injuries sustained by employees in intrastate commerce and relating to the scope or construction of the Federal Safety Appliance Acts are, of course, federal questions which may appropriately be reviewed in this court. . . . The Federal Safety Appliance Acts, while prescribing absolute duties, and thus creating correlative rights in favor of injured employees, did not attempt to lay down rules governing actions or enforcing these rights. . . . But the act made no provision as to the place of suit or the time within which it should be brought, or as to the right to recover, or as to those who should be beneficiaries of recovery, in case of the death of the employee. While dealing with assumption of risk, the statute did not affect the defense of contributory negligence and hence that defense was still available according to the applicable state law. [Citing the Schlemmer (220 U. S. 590 [31 Sup. Ct. 561, 55 L. Ed. 596]) and Popplar (237 U. S. 369 [35 Sup. Ct. 609, 59 L. Ed. 1000]) cases.] In these respects the amended act of 1903 made no change, . . .

"The Safety Appliance Acts having prescribed the duty in this fashion, the right to recover damages sustained by the injured employee through the breach of duty sprang from the principle of the common law . . . and was left to be enforced accordingly, or, in case of the death of the injured employee, according to the applicable statute. . . . 'The federal statute, in the present case, touched the duty of the master at a single point and, save as provided in the statute,

the right of the plaintiff to recover was left to be determined by the law of the state.' "

In *Gilvary* v. *Cuyahoga Valley Ry. Co.*, 292 U. S. 57 [54 Sup. Ct. 573, 78 L. Ed. 1123], we find the following: "Petitioner cites language in *Texas & Pacific Ry. Co.* v. *Rigsby*, 241 U. S. 33, 41 [36 Sup. Ct. 482, 60 L. Ed. 874]. But that case is not in point on the question under consideration in this case. There we were called upon to decide whether a railroad employee engaged in intrastate commerce upon the line of an interstate carrier was within the protection of the Safety Appliance Acts. We held that he was. The opinion supports our recent construction of these acts that, while they prescribe the duty, the right to recover damages sustained by the injured employee through the breach 'sprang from the principle of the common law' and was left to be enforced accordingly, or in case of death 'according to the applicable statute'." (Citing *Moore* v. *Chesapeake & O. Ry. Co.*, *supra; Minneapolis & St. Paul etc. Ry. Co.* v. *Popplar*, 237 U. S. 369 [35 Sup. Ct. 609, 59 L. Ed. 1000].) "These acts do not create, prescribe the measure or govern the enforcement of, the liability arising from the breach."

As is said in the Gilvary case, *supra*, with respect to the Safety Acts: "They do not extend to the field occupied by the State Compensation Acts."

While these decisions dealt with the Safety Appliance Act, it has been held in a case under the Boiler Inspection Act, where similar questions were raised, that the fact it arose under the latter act "is a distinction involving no different question". (*Rice* v. *Baltimore & O. R. Co.*, 42 Fed. (2d) 387.)

It thus appears that the Boiler Inspection Act does not purport to provide remedial procedure where it is to be invoked as a ground of recovery for death independently of its application with the Liability Act in an interstate case; hence, in an intrastate case such as this, the state law applies.

A cause of action for wrongful death of another is, in California, brought under the provisions of section 377 of the Code of Civil Procedure, and the period of limitations (one year) runs from the date of the death and not from the date of the accident (*Marks* v. *Reissinger*, 35 Cal. App. 44 [169 Pac. 243]), and our former holding that it ran from the date of the accident was erroneous. (8 Cal. Jur. 1039; *Tann* v. *Western Pac. R. R.*, 39 Cal. App. 377 [178 Pac. 971].)

■ It is settled that where suit is brought upon two different theories, if there is evidence sufficient to sustain either of them and the verdict of the jury be a general one, the general verdict will stand, as it imports an implied finding (in a case such as this), that the Boiler Inspection Act was violated in that the engine had a leaky throttle. (*Sessions* v. *Pacific Improvement Co.*, 57 Cal. App. 1 [206 Pac. 653]; *Merrill* v. *Kohlberg*, 29 Cal. App. 382 [155 Pac. 824]; 24 Cal. Jur. 885, 886.) The evidence in this case supports the view that the engine moved backward as the result of a leaky throttle. Where as here there is testimony that the throttle was closed, and evidence that the throttle leaked, simple principles of physics would indicate that, when it suddenly walked, jumped or moved backwards, steam must have gotten from the steam chest into the cylinders in sufficient quantity to move the pistons. The jury was not bound by defendant's attempted explanation of the backward movement of the engine.

■ The appellant's contentions that the sole remedy of an employee of a common carrier, engaged in interstate transportation, or, in this case, of his personal representative, where, at the time of the injury, the employee was not engaged in interstate transportation, but under circumstances where there has been a violation of duty imposed by the Boiler Inspection Act, is under the State Workmen's Compensation Act. The evidence here shows that the accident happened on a highway of interstate commerce. (Reporter's transcript, p. 201, line 18; p. 312, lines 12–19; p. 312, lines 22–26; p. 313, lines 1–5.)

Under the authority of *Ballard* v. *Sacramento Northern Ry. Co.*, 126 Cal. App. 486 [14 Pac. (2d) 1045, 15 Pac. (2d) 793], the instant suit is maintainable.

■ The instructions given below are, upon the whole, fair, and error, if any, in the admission of the testimony given by Walton in the federal case, is not of sufficient consequence to justify a reversal of the judgment.

For the foregoing reasons, the judgment is affirmed.

Tyler, P. J., and Knight, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on August 2, 1935, and an appli-

cation by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on August 29, 1935.