OPINION OF THE COURT
JORDAN, Circuit Judge.
This case requires us to determine the scope of federal preemption under the Locomotive Inspection Act (“LIA”), 49 U.S.C. § 20701. Appellant Delaware & Hudson Railway Company, Inc., doing business as Canadian Pacific Railway, and its subsidiaries (collectively, with the parent company, “Canadian Pacific”) settled lawsuits brought by its employees who had suffered injuries as a result of defective train seats. Canadian Pacific then brought indemnification, contribution, and breach-of-contract claims against Knoedler Manufacturing, Inc. (“Knoedler”), which supplied the seats, and Durham Industrial Sales, Inc. (“Durham”), which tried unsuccessfully to repair the seats. Upon motions filed by Knoedler and Durham (collectively the “Appellees”), the United States District Court for the Western District of Pennsylvania dismissed Canadian Pacific’s claims, holding that they were preempted by the LIA. We disagree and will vacate the District Court’s orders of dismissal and remand for further proceedings.
I. Background

A. Statutory and Regulatory Background

The LIA provides that “a locomotive ... and its parts and appurtenances” must be “in proper condition and safe to operate without unnecessary danger of personal injury.”[1] 49 U.S.C. § 20701(1). Pursuant to the LIA, the Federal Railroad Administration, which acts under the authority of the Secretary of Transportation, 49 U.S.C. *659 § 103(a), has promulgated regulations on the governing standards of care for locomotive equipment, including seats, 49 C.F.R. § 229.119(a) (requiring locomotive seats to “be securely mounted and braced”).
While the LIA and its regulations provide binding standards for the suppliers of locomotives and locomotive equipment, as well as for railroad companies, 49 U.S.C. § 21302(a)(1); 49 C.F.R. § 229.7(b), the statute does not provide a private right of action to employees injured by defective equipment. Urie v. Thompson, 337 U.S. 163, 188-89, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949). Instead, an injured employee must bring an action against his employer under the Federal Employers’ Liability Act (“FELA”), 45 U.S.C. § 51 et seq. The LIA supplements the FELA “by imposing on interstate railroads an absolute and continuing duty to provide safe equipment” and has the “purpose and effect of facilitating employee recover[y].” Urie, 337 U.S. at 188-89, 69 S.Ct. 1018 (citation and internal quotation marks omitted).
Once an employer has been found liable in a FELA action, “it accords, with the FELA’s overarching purpose to require the employer to bear the burden of identifying other responsible parties and demonstrating that some of the costs of the injury should be spread to them.” Norfolk & W. Ry. Co. v. Ayers, 538 U.S. 135, 165, 123 S.Ct. 1210, 155 L.Ed.2d 261 (2003); see also Ellison v. Shell Oil Co., 882 F.2d 349, 353 (9th Cir.1989) (“FELA’s purpose of providing recovery for injured workers is not defeated by permitting an employer to recoup its losses in part or in full from a third party, when the circumstances and state law permit.”).
B. Factual History[2]
General Electric (“GE”) built and maintained the locomotives at issue in this case, under a contract it had with Canadian Pacific. Pursuant to that agreement, Canadian Pacific directed GE to install seats purchased from Knoedler. GE complied, and Knoedler “agreed to provide seats of suitable quality to prevent seat failures, and suitable for use in Canadian Pacific’s locomotives, in the future.” (App. at 50.)
In the late 1990s and early 2000s, GE and Canadian Pacific became aware of problems with seat safety and identified defects that were causing the seats to break. GE discussed the nature of the defects and the repair process with Knoe-dler but grew concerned that Knoedler would be unable to make the necessary .repairs. To allay that concern, Knoedler introduced GE to Durham and “promised that Durham had the expertise and capacity to repair the seats on Knoedler’s behalf.” (Appellant’s Opening Br. at 6-7.)
GE and Durham subsequently entered. into a contract under which “Durham agreed to refurbish the Knoedler Seats in such a way as to prevent future seat failures.” (App. at 51.) Despite those repair efforts, the seats continued to break and, as a consequence, four Canadian Pacific employees were injured. The railroad eventually settled with its employees for a total of approximately $2.7 million. Thereafter, it sought to recoup its losses from Knoedler and Durham.

*660
C. Procedural History

Canadian Pacific filed this action against Knoedler and Durham on December 16, 2011, asserting claims for indemnification, contribution, breach of contract (with Canadian Pacific claiming the rights of a third-party beneficiary), product liability, and negligence under Pennsylvania law. On March 9, 2012, Knoedler filed a motion to dismiss the complaint. In response, the • railroad filed its First Amended Complaint on March 30, 2012,. reasserting the same claims but clarifying that the claims were based on the Appellees’ violations of the LIA and their breach of contractual promises to provide LIA-compliant seats.[3] Shortly thereafter, Durham and Knoedler filed their motions to dismiss the First Amended Complaint.
On February 12, 2013, the District Court issued an Order and Memorandum Opinion dismissing Canadian Pacific’s indemnification and contribution claims with prejudice,[4] concluding that they were preempted by the LIA. The Court also dismissed the breach-of-contract claims, saying that the company had not adequately pled its status as a third-party beneficiary. The Court did, however, allow Canadian Pacific to amend its contract claims, and it did so, providing additional details about its standing as a third-party beneficiary of the contracts. On August 1, 2013, the Court issued a second Order and Memorandum Opinion dismissing the breach-of-contract claims, concluding that they were also preempted under the LIA. Canadian Pacific timely appealed both of the District Court’s Orders.
II. Discussion[5]
Canadian Pacific raises two arguments on appeal: first, that its indemnification and contribution claims are not preempted by the LIA because they are premised on a violation of federal standards set by the LIA and accompanying regulations, and, second, that its breach-of-contract claims are not preempted by the LIA because they are premised on a violation of express contractual duties. We address those arguments in turn.

A. Preemption of Canadian Pacific’s Indemnification and Contribution Claim

Congressional power to preempt state law derives from the Supremacy Clause of the Constitution, which provides that federal law “shall be the supreme Law of the Land ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.” U.S. Const, art. VI, cl. 2. “Consideration of issues arising under the Supremacy Clause start[s] *661 with the assumption that the historic police powers of the States [are] not to be superseded by ... [federal law] unless that [is] the clear and manifest purpose of Congress.” Cipollone v. Liggett Grp., Inc., 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (first, second, and fourth alterations in original) (citation and internal quotation marks omitted). “Often Congress does not clearly state in its legislation whether it intends to pre-empt state laws.... ” Malone v. White Motor Corp., 435 U.S. 497, 504, 98 S.Ct. 1185, 55 L.Ed.2d 443 (1978). When that is the case, “courts normally sustain local regulation of the same subject matter unless it conflicts with federal law or would frustrate the federal scheme, or unless the courts discern from the totality of the circumstances that Congress sought to occupy the field to the exclusion of the States.” Id. At issue here is that latter type of exclusion, known as “field preemption.”
The paramount cases concerning preemption under the LIA are Napier v. Atlantic Coast Line Railroad, 272 U.S. 605, 47 S.Ct. 207, 71 L.Ed. 432 (1926), and Kurns v. Railroad Friction Products Corp., — U.S. -, 132 S.Ct. 1261, — L.Ed.2d - (2012). Napier involved challenges to two state statutes: a Georgia statute that required fire boxes on locomotives to be equipped with an automatic door, and a Wisconsin statute that required locomotives to have cab curtains.[6] Napier, 272 U.S. at 607, 47 S.Ct. 207. The Supreme Court held that the LIA preempted both state statutes because it was “intended to occupy the field” pertaining to “the design, the construction, and the material of every part of the locomotive and tender and of all appurtenances.” Id. at 611, 613, 47 S.Ct. 207. Napier thus concluded that only the Interstate Commerce Commission — the agency then responsible for implementing the LIA — had the authority to “set[] the standard” by which a locomotive’s “fitness for service shall be determined.” Id. at 612, 47 S.Ct. 207.
The Supreme Court recently revisited the preemptive effect of the LIA in Kums, in which it affirmed our decision upholding the dismissal of an action for injuries from defective locomotive parts. 132 S.Ct. at 1270. The plaintiffs in Kums asserted design-defect and failure-to-warn claims against locomotive equipment manufacturers. Specifically, the plaintiffs argued that, under Pennsylvania law, the equipment was defectively designed because it contained asbestos and that the manufacturers failed to warn them about dangers posed by asbestos exposure. Id. at 1264-65. The Supreme Court rejected those claims, recognizing that they were “directed at the equipment of locomotives,” id. at 1269, and “f[e]ll within the [preempted] field ... as ... defined in Napier,” id. at 1270. In so ruling, the Kwms Court also rejected the plaintiffs’ argument that “the LIA’s pre-emptive scope does not extend to state common-law claims, as opposed to state legislation or regulation.” Id. at 1269. The Court noted that Napier’s *662 “categorical conclusion [of LIA preemption] admits of no exception for state common-law duties and standards of care.” Id.
Knoedler and Durham incorrectly read Napier and Kums to say that all state claims regarding the design and manufacture of locomotive equipment are preempted by the LIA. But those decisions did not speak so broadly. They were explicit in holding, and only holding, that a state may not impose its own duties and standards of care on the manufacture and maintenance of locomotive equipment. See Kurns, 132 S.Ct. at 1269 (“We therefore conclude that state common-law duties and standards of care directed to the subject of locomotive equipment are pre-empted by the LIA.”); Napier, 272 U.S. at 613, 47 S.Ct. 207 (“[Requirements by the states [regarding locomotive equipment] are precluded, however commendable or however different their purpose.”). The question left unanswered by Napier and Kums is whether the LIA preempts a state claim that is premised on a violation of the duties and standards of care stemming from the LIA itself; in other words, whether a state claim based on a federal standard of care is preempted. We conclude that it is not.
While there is no Supreme Court authority exactly on point, there are plenty of strong hints that such an avenue to relief is not foreclosed. The Court has held in other statutory contexts that violations of federal law can be redressed through state common-law claims. See, e.g., Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 258, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984) (concluding that a state-law remedy based on a violation of the Atomic Energy Act was not preempted); see also Abdullah v. Am. Airlines, Inc., 181 F.3d 363, 367 (3d Cir.1999) (noting that “[f]ederal preemption of the standards of care can coexist with state and territorial tort remedies” and holding that state law remedies for a violation of the Federal Aviation Act were not preempted).[7] More particularly, in the context of railroad safety laws, state-law claims have been permitted as a means to redress federal violations. For example, in Crane v. Cedar Rapids & Iowa City Railway Co., the Supreme Court stated that a railroad employee can enforce a violation of the Safety Appliance Acts *663 (“SAAs”), 49 U.S.C. § 20301 et seq., through the FELA but that a .“nonemploy-ee must look for his remedy to a common law action in tort, which is to say that he must sue in a state court, in absence of diversity, to implement a state cause of action.”[8] 395 U.S. 164, 166, 89 S.Ct. 1706, 23 L.Ed.2d 176 (1969). The Court had in fact reached that same conclusion almost three decades earlier in Tipton v. Atchison Tulsa, & Santa Fe Railway Co., when it stated that the SAAs “do not give a right of action for their breach, but leave the genesis and regulation of such action to the law of the states.” 298 U.S. 141, 147-48, 56 S.Ct. 715, 80 L.Ed. 1091 (1936). Thus, the Court could say a few years later that there is no longer any question “as to the power of the state to provide whatsoever remedy it may choose for breaches of the [SAAs]. The federal statutes create the right; the remedy is within the state’s discretion.” Breisch v. Cent. R.R. of N.J., 312 U.S. 484, 486, 61 S.Ct. 662, 85 L.Ed. 964 (1941).
Those cases are particularly relevant here, as the SAAs are analogous to the LIA in many important respects. The SAAs, like the LIA, regulate locomotive equipment.[9] 49 U.S.C. § 20302. Indeed, the “congressional purpose underlying [the LIA] is basically the same as that underlying [the SAAs]” — -namely that locomotive equipment “be employed in active service without unnecessary peril to life or limb.” Urie, 337 U.S. at 190, 69 S.Ct. 1018 (citation and internal quotation marks omitted). Furthermore, neither the LIA nor the SAAs provide for private enforcement; instead, railroad employees can only enforce those statutes through the FELA. Urie, 337 U.S. at 188-89, 69 S.Ct. 1018. “In this view, [the SAAs], together with the [LIA], are substantively if not in form amendments to the [FELA].” Id. at 189, 69 S.Ct. 1018.
With respect to preemption, both the LIA and the SAAs have broad preemptive scope. See Kurns, 132 S.Ct. at 1267 (“Congress, in enacting the LIA, ‘manifested] the intention to occupy the entire field of regulating locomotive equipment.’ ” (alteration in original) (quoting Napier, 272 U.S. at 611, 47 S.Ct. 207)); Gilvary v. Cuyahoga Valley Ry. Co., 292 U.S. 57, 60-61, 54 S.Ct. 573, 78 L.Ed. 1123 (1934) (“So far as the safety equipment of [railroad] vehicles is-concerned, [the SAAs] operate to exclude state regulation whether consistent, complementary, additional, or otherwise.”). It is true that Napier suggested that the scope of the SAAs’ preemption is *664 limited to the specific equipment listed in the statute, Napier, 272 U.S. at 611, 47 S.Ct. 207, but both Crane and Tipton involved a coupler, which is expressly covered by the SAAs, Crane, 395 U.S. at 165, 89 S.Ct. 1706; Tipton, 298 U.S. at 145, 56 S.Ct. 715. Thus, the full preemptive effect of the federal law was operative with respect to that equipment and yet the Supreme Court allowed state common-law actions to remedy violations of the SAAs.[10] Like the LIA, the SAAs are silent as to whether state remedies are preempted.[11] Despite that silence, the Supreme Court decided in Crane and Tipton that relief under state law was not preempted.[12]
Furthermore, congressional intent— which is “the ultimate touchstone of preemption analysis,” Abdullah, 181 F.3d at 365 (citation and internal quotation marks omitted) — suggests that state law remedies are not preempted under the LIA. Congress’s silence with respect to state-law remedies “takes on added significance in light of [its] failure to provide any federal remedy” for LIA violations. Silk-wood, 464 U.S. at 251, 104 S.Ct. 615 (analyzing Congressional intent regarding the scope of preemption under the Atomic Energy Act). If we were to hold that state law claims asserting a violation of the LIA are preempted, railroads would be left with no remedy, no matter how obvious or egregious the liability of an equipment supplier.[13] We are not commenting on *665 the culpability of the Appellees here but are simply noting that Canadian Pacific cannot sue them directly under the LIA because the LIA does not provide for a private right of action. Similarly, Canadian Pacific cannot sue them under the FELA because that statute gives a remedy only to railroad employees. “It is difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct.” Silkwood, 464 U.S. at 251, 104 S.Ct. 615. And yet that would be the result if Canadian Pacific’s state law indemnification and contribution claims are preempted.[14]
There are other railroad-related cases in which the Supreme Court has approved, in fact encouraged, the use of state-law claims to redress violations of federal law. For example, in Norfolk & Western Railway Co. v. Ayers, the Court declined to allow the defendant railroad to have FELA damages apportioned to third-party tortfeasors who contributed to plaintiffs’ asbestos-related injuries. 538 U.S. at 143, 123 S.Ct. 1210. The problem was not with making the third-party tortfeasors share the load. The problem was with making that sharing a matter of dispute in the FELA action, so that the injured employee had to engage in the fight over apportioning fault. The Supreme Court stated that “[o]nce an employer has been adjudged negligent ... it accords with the FELA’s overarching purpose to require the employer to bear the burden of identifying other responsible parties and demonstrating that some of the costs of the injury should be spread to them.” Id. at 165, 123 S.Ct. 1210. In so concluding, the Court relied on the “numerous FELA decisions ... recognizing that FELA defendants may bring indemnification and contribution actions against third parties under otherwise applicable state or federal law.” Id. at 162, 123 S.Ct. 1210.
One of those FELA decisions was Engvall v. Soo Line Railroad Co., in which the Supreme Court of Minnesota held that, in circumstances nearly identical to those here, state-law claims redressing violations of the LIA are not preempted. See 632 N.W.2d 560, 571 (Minn.2001) (holding that a railroad’s third-party complaint seeking contribution and/or indemnification from an equipment manufacturer to recoup FELA losses was not preempted because the railroad’s claims were based on violations of the LIA, not state standards). The District Court rejected Engvall, noting that it has been criticized by other courts.[15] But the one Court we must attend to most carefully, the Supreme Court, *666 favorably cited Engvall twice in Ayers as an example of a case where a railroad was able to recoup its FELA losses through state-law indemnification and contribution claims. Ayers, 538 U.S. at 162 n. 21, 164 n. 23.
Furthermore, the policy behind preemption does not support excluding the state-law claims at issue here. The primary rationale for federal preemption in the field of railroad safety regulation is national uniformity. Preemption allows railroad carriers to abide by a single set of national equipment regulations, instead of having to meet different standards and, potentially, to change equipment when a train crosses state lines. Kurns v. A.W. Chesterton Inc., 620 F.3d 392, 398 (3d Cir.2010), aff'd sub nom., Kurns, 132 S.Ct. 1261 (“The goal of the LIA is to prevent the paralyzing effect on railroads from prescription by each state of the safety devices obligatory on locomotives that would pass through many of them.” (citation and internal quotation marks omitted)). It is therefore clear why Napier and Kums did not allow states to impose their own standards of care — either through state regulations or through state tort liability — with respect to locomotive equipment. But the enforcement under state law of a federal standard of care does not undermine national uniformity because it does not impose conflicting regulations that a railroad must heed during interstate travel.
Congress itself has indicated that the goal of uniform railroad operating standards is not undermined when state-law claims are used to enforce federal law. For example, Congress explicitly stated in the Federal Railroad Safety Act that state law claims seeking damages for federal violations are not preempted. 49 U.S.C. § 20106(b)(1). If Congress thought state claims alleging a failure to comply with federal railroad safety laws would jeopardize uniformity, then it would have declared the elimination rather than the saving of such claims. And the Federal Railroad Administration — the agency responsible for implementing the LIA as well as the Federal Railroad Safety Act — has confirmed that state-law claims can be used to enforce a federal standard of care. See Passenger Equipment Safety Standards; Front End Strength of Cab Cars and Multiple-Unit Locomotives; Final Rule, 75 Fed.Reg. 1180, 1208 (Jan. 8, 2010) (“[The Federal Railroad Administration] was careful to convey that Federal preemption under [the Federal Railroad Safety Act] applied to standards of care under State law — as opposed to claims (causes of action) under State law. They are different.”). It is also noteworthy that state courts already interpret the LIA because FELA claims based on violations of the LIA that are filed in state courts cannot be removed to federal court.[16] 28 U.S.C. § 1445(a).
*667 In light of the foregoing, the District Court erred in holding that Canadian Pacific’s indemnification and contribution claims are preempted.

B. Preemption of Canadian Pacific’s Breach-of-Contract Claims

Canadian Pacific’s breach-of-contract claims also should have survived the motions to dismiss. As noted earlier, the railroad argues that both Knoedler and Durham breached their contractual obligations to supply GE with LIA-compliant seats. Claiming the status of a third-party beneficiary to those contracts, Canadian Pacific seeks relief for those breaches.
Much of the analysis described above with respect to the indemnification and contribution claims also applies to the breach-of-contract claims. Just as there is room for state tort remedies, there is room for state contract remedies associated with the federal standards embodied in the LIA. The breach-of-contract claims do not require Knoedler or Durham to comply with a state duty or standard of care. Instead, Canadian Pacific seeks to enforce contractual provisions that call for compliance with federal law. Enforcing the contracts would therefore not detrimentally affect national uniformity of railroad operating standards. Uniformity is to be expected because it is in the interest of the contracting parties. Having one set of national regulations to follow is important both to railroads and to equipment suppliers for the obvious reason that neither wants to deal with a multiplicity of possibly conflicting state standards. Therefore, in delineating their duties under a contract, the railroads and their suppliers will be fully motivated to ensure that all provisions regarding equipment design and manufacture are based on a uniform federal standard of care.
But even if the LIA did preempt Canadian Pacific’s indemnification and contribution claims, it would not follow that the LIA preempts the breach-of-eon-tract claims, because breach-of-contract claims involve voluntarily assumed duties as opposed to duties imposed by state law.[17] “[W]hen a party to a contract vol *668 untarily assumes an obligation to proceed under certain state laws, traditional preemption doctrine does not apply to shield a party from liability for breach of that agreement.” Epps v. JP Morgan Chase Bank, N.A., 675 F.3d 315, 326 (4th Cir.2012). There is a salutary “you’ve made your own bed, now lie in it” quality to several cases from the Supreme Court that emphasize the importance of voluntarily assumed contractual obligations. See Am. Airlines, Inc. v. Wolens, 513 U.S. 219, 228, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995) (“We do not read the [Airline Deregulation Act]’s preemption clause ... to shelter airlines from suits alleging no violation of state-imposed obligations, but seeking recovery solely for the airline’s alleged breach of its own, self-imposed undertakings.”); Cipollone, 505 U.S. at 526, 112 S.Ct. 2608 (plurality opinion) (holding that a breach-of-warranty claim was not preempted by the Federal Cigarette Labeling and Advertising Act because “a common-law remedy for a contractual commitment voluntarily undertaken should not be regarded as a requirement ... imposed under State law” (alteration in original) (internal quotation marks omitted)); see also Nw., Inc. v. Ginsberg, — U.S. -, 134 S.Ct. 1422, 1432-33, 188 L.Ed.2d 538 (2014) (holding that the Airline Deregulation Act preempted claims alleging breach of an implied covenant because, under the controlling state law, parties could not contract out of such covenants — and thus they were “regarded as state-imposed” — but noting that if a state permitted parties to voluntarily surrender protections from covenants, then those claims would “escape preemption”).
That some of those cases involved express preemption as opposed to field preemption does not change the analysis. The same principle applies, regardless of the breadth of preemption: duties voluntarily undertaken cannot be considered as “state imposed.” Because Kurns concluded only that “state common-law duties and standards of care” are preempted by the LIA, Kurns, 132 S.Ct. at 1269, — and not voluntary contractual duties — even the broad field preemption of the LIA does not rule out Canadian Pacific’s breach-of-contract claims.[18]
To hold that the LIA preempts all breach-of-contract claims would allow, and perhaps encourage, manufacturers to make grand contractual promises to obtain a deal and then breach their duties with impunity. Knoedler’s and Durham’s only response to the perverse incentives inherent in their arguments is a shoulder shrug. “Let the market sort things out,” they say. As counsel for Durham put it at oral argument, “the people who are being put upon by this lack of remedy are not your average consumers; they are railroads, in this case a huge railroad, with incredible economic power to buy or not buy from various people.” (Oral Arg. at 23:2543.) But even the rich and powerful are entitled to *669 the rule of law, and we see no reason to believe that Congress meant for Darwinian attrition to replace legal remedies.
V. Conclusion
Canadian Pacific’s state law claims of indemnification and contribution based on the LIA are not preempted, nor are its breach-of-contract claims. We will therefore vacate the District Court’s Orders dismissing the First and Second Amended Complaints and remand for further proceedings consistent with this opinion.

. The LIA was previously known as the Boiler Inspection Act ("BIA”), which covered only locomotive boilers. Act of Feb. 17, 1911 ch. 103, § 2, 36 Stat. 913, 91314. In 1915, Congress amended the BIA’s scope to cover the entire locomotive and its parts and appurtenances. Act of Mar. 4, 1915, ch. 169, § 1, 38 Stat. 1192, 1192. It provides:
A railroad carrier may use or allow to be used a locomotive or tender on its railroad line only when the locomotive or tender and its parts and appurtenances—
(1) are in proper condition and safe to operate without unnecessary danger of personal injury;
(2) have been inspected as required under this chapter and regulations prescribed by the Secretary of Transportation under this chapter; and
(3) can withstand every test prescribed by the Secretary under this chapter.
49 U.S.C. § 20701.

. Because the District Court dismissed Canadian Pacific's first and second amended complaints in response to the Appellees’ Rule 12(b)(6) motions to dismiss, we accept as true all facts alleged in Canadian Pacific’s amended complaints and draw all reasonable inferences in favor of Canadian Pacific. Phillips v. Cnty. of Allegheny, 515 F.3d 224, 231 (3d Cir.2008).

. Canadian Pacific later withdrew its product liability and negligence claims at a hearing held on January 24, 2013.

. The District Court's first Order and Memorandum Opinion references only Canadian Pacific’s indemnification claims, not its contribution claims. The parties evidently agree that the Court was addressing both indemnification and contribution, and it appears to us, based on the District Court's first Order granting the Appellees’ motions to dismiss, that the Court in fact dismissed both the indemnification and the contribution claims but simply referred to those claims in short as being for indemnification.

.The District Court had subject matter jurisdiction under 28 U.S.C. § 1332(a)(3). Durham had argued that the Court did not have personal jurisdiction over it, but because the Court dismissed this matter on preemption grounds alone, the personal jurisdiction issue was not addressed. Nothing in our disposition of this matter implies any opinion on any argument Durham may, upon remand, seek to advance on personal jurisdiction. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291 and we exercise plenary review over the orders of dismissal. Grier v. Klem, 591 F.3d 672, 676 (3d Cir.2010).

. Both the Georgia and Wisconsin statutes addressed health and safety concerns. The automatic door on fire boxes protected firemen from exposure to extreme temperatures while stoking the furnace powering the locomotive; it protected the firemen’s eyesight by reducing glare from the fire (and consequently protected travelers for whom firemen kept a lookout when the railroad crossed highways); and it protected employees and the train itself in the event of an explosion in the fire box. Napier, 272 U.S. at 609-10, 47 S.Ct. 207. Cab curtains prevented snow from piling into the locomotive cabs in the winter months and provided some measure of protection against wind and cold temperatures, thereby protecting engineers and firemen from discomfort and weather-related illnesses. Id. at 610, 47 S.Ct. 207.

. Silkwood. and Abdullah are instructive even though they involved express preemption clauses because the Atomic Energy Act and the Federal Aviation Act also occupy their particular fields. Silkwood, 464 U.S. at 240-41, 249, 104 S.Ct. 615 (stating with respect to the Atomic Energy Act that “the federal government has occupied the entire field of nuclear safety concerns, except the limited powers expressly ceded to the states” (internal citation and quotation marks omitted)); Abdullah, 181 F.3d at 367 ("[W]e hold that [the Federal Aviation Act] establishes the applicable standards of care in the field of air safety, generally, thus preempting the entire field from state and territorial regulation.”); see also Altria Grp., Inc. v. Good, 555 U.S. 70, 76, 129 S.Ct. 538, 172 L.Ed.2d 398 (2008) (noting that even if a statute contains an express preemption clause, “the scope of the statute [could still] indicate[] that Congress intended federal law to occupy the legislative field”). The Appellees argue that Silkwood and Abdul-lah are inapplicable because, as distinguished from the LIA which is silent on the point, Congress indicated in the Atomic Energy Act and the Federal Aviation Act that state common-law remedies would remain available. Silkwood, 464 U.S. at 251, 104 S.Ct. 615 ("[T]he only congressional discussion concerning the relationship between the Atomic Energy Act and state tort remedies indicates that Congress assumed that such remedies would be available.”); Abdullah, 181 F.3d at 375-76 (noting that the Federal Aviation Act’s Savings and Insurance Clauses suggest that Congress did not intend to preempt state-law remedies). Those cases stand for the larger premise, however, that even when Congress has occupied a particular field, state-law claims to remedy federal violations are not necessarily preempted.

. Knoedler argues that Canadian Pacific is “standing in the shoes of its employees” and therefore "is not, in a technical sense, a 'non-employee' ” able to assert state claims under Crane. (Knoedler Br. at 42.) But the FELA specifically defines who is considered an "employee” and Canadian Pacific does not fall within that definition. See 45 U.S.C. § 51 ("Any employee of a carrier, any part of whose duties ... shall be the furtherance of interstate or foreign commerce; or shall, in any way ... affect such commerce as above set forth shall ... be considered as being employed by such carrier in such commerce and shall be considered as entitled to the benefits of this chapter.”). Furthermore, Knoedler’s argument that Canadian Pacific is not an employee — so it has no cause of action under the FELA — but at the same time is an employee — so it cannot bring state-law claims for LIA violations either — sets up a needless no-win scenario for railroads. See infra at pp. 662-63.

. The SAAs differ from the LIA in that they expressly require certain safety equipment to be used on railroad carriers, such as automatic couplers, efficient hand brakes, secure ladders with handholds or grab irons, and power brakes sufficient to stop the train. 49 U.S.C. § 20302. The LIA, however, more generally requires that a locomotive and all its parts and appurtenances be in proper condition, safe to operate, and adequately inspected and tested. 49 U.S.C. § 20701.

. Tipton’s approval of Walton v. Southern Pacific Co., 8 Cal.App.2d 290, 48 P.2d 108 (1935), is also telling. In Walton, the California Court of Appeals applied the state’s statute of limitations to a wrongful-death claim alleging a violation of the LIA, relying in part on cases involving the SAAs. Walton, 48 P.2d at 115. The Supreme Court expressly approved that analysis, stating that the Walton court "[cjorrectly [held] that the same principles apply in an action under [the LIA] as in one under [the SAAs].” Tipton, 298 U.S. at 151, 56 S.Ct. 715.

. As discussed previously, supra note 7, the Appellees discounted Sillcwood and Abdullah as being irrelevant in part because Congress had indicated with respect to the statutes at issue in those cases that state-law remedies would be excluded from preemption. That argument fails with respect to the SAAs, further confirming that the Crane line of cases are meaningful to the question of the preemptive scope of the LIA.

. Our dissenting colleague argues that Crane, Breisch, and Tipton have little legal force in light of Kurns, and that, to the extent they are still viable decisions, they should be read as only applying to the SAAs, not the LIA. Dissent slip op. at 673-74. But nothing in the Kums opinion undercuts or calls into question the SAAs line of cases; in fact, the Supreme Court did not once mention any of those cases in its decision. Especially given the similarities between the LIA and the SAAs, if the Supreme Court had intended to cast doubt on the vitality of its decisions in the context of the SAAs, it would have done so explicitly. Although the dissent accuses us of giving "short shrift to Kurns," Dissent slip op. at 672, we are faithfully applying the holding of Kums, instead of unnecessarily and, in our view, unwisely expanding its language to cover the situation at issue here, as the dissent would do.

.The dissent contends that it is "crystal clear” that the purpose of the LIA was not to protect railroads from lawsuits. Dissent slip op. at 669-70. But Congress did intend to protect railroads' interests through the LIA, as we explained in our opinion in the Kums case: "The goal of the LIA is to' prevent the paralyzing effect on railroads from prescription by each state of the safety devices obligatory on locomotives that would pass through many of them.” Kurns v. A.W. Chesterton Inc., 620 F.3d 392, 398 (3d Cir.2010), aff'd sub nom., Kurns, 132 S.Ct. 1261 (citation and internal quotation marks omitted). The dissent clearly agrees that the LIA does have that purpose, given that one of the primary arguments in the dissent is that allowing state-law claims to redress LIA violations will threaten national uniformity of railroad safety regulations. In so arguing, however, our colleague is essentially saying that the LIA was intended both to protect railroads from conflicting state regulations and also to purposefully exclude railroads from obtaining judicial re *665 course in a case like this. We consider that outcome inconsistent and untenable.

. The Appellees contend that the Ninth Circuit has rejected the argument that the lack of a legal remedy should weigh in an analysis of the preemptive effect of the LIA. That court said in Law v. General Motors Corp., that, > "[bjecause railroad operators are liable for any injuries suffered by their employees, they would not buy locomotives, cars and other equipment that fall short of [LIA] standards." 114 F.3d 908, 912 (9th Cir.1997). Knoedler relies on that to argue that, if Canadian Pacific believes that Knoedler sells a defective product, "it can see that justice is done by not buying equipment from Knoedler or using a locomotive with a Knoedler component again.” (Knoedler Br. at 34.) We decline to adopt that analysis. While market forces may have a long-term impact on the conduct of equipment manufacturers, they do not provide a remedy for losses already incurred because of the violations of governing standards of care. If Congress intended to foreclose all legal remedies available to railroad companies seeking to recoup FELA damages, it likely would have said so plainly.

. The District Court also relies on a number of cases reaching a conclusion arguably at odds with Engvall, but those cases are distinguishable because they are either actions by railroad employees who already had a remedy under the FELA, or they involved causes of action asserting state standards of care, as *666 opposed to federal standards of care. See Stevenson v. Union Pac. R.R. Co., No. 4:07CV00522BSM, 2009 WL 129916, at *1 (E.D.Ark. Jan. 20, 2009) ("[Union Pacific] seeks contribution and indemnification from Seats based on theories of breach of warranty, negligence, and strict liability.”); Bonner v. Union Pac. R.R. Co., No. CV03-134-S-MHW, 2005 WL 1593635, at *10 (D.Idaho 2005) ("Nowhere in this statement is the Court able to discern an argument that GM-EMD violated the federal standard imposed by LIA.”); Roth v. I & M Rail Link, L.L.C., 179 F.Supp.2d 1054, 1063-64 (S.D.Iowa 2001) ("Roth was a railroad employee, and here a federal cause of action under FELA exists.”); Union Pac. R.R. Co. v. Motive Equip., Inc., 291 Wis.2d 236, 714 N.W.2d 232, 234 (Wis.Ct.App.2006) (rejecting Union Pacific's assertion that the manufacturer was liable for negligence, strict products liability, and breach of warranties).

. That fact alone negates the dissent’s contention that allowing state-law remedies for *667 LIA violations poses a significant threat to national uniformity, Dissent slip op. at 670-72. Because state courts are already interpreting the LIA, any danger to uniformity, to the extent it can be called a danger, is already present. There is always a possibility that, at the margins, state courts will differ in their interpretations of the federal standard of care, but the Supreme Court has not expressed concern with that possibility and neither do we. Further, the hypothetical posed by the dissent — in which a person struck by a train could sue a railroad under strict liability in one state but not in another, Dissent op. at 670-71 —does not address differing standards of care. It only concerns whether a wanderer could sue under the LIA. It does not explain how differing state laws that affect who may sue would result in differing substantive standards directed at railroads.

. Knoedler argues that Canadian Pacific is impermissibly attempting to circumvent the absence of a private right of action in the LIA by restating its tort claims as breach-of-contract claims. Knoedler relies on Astra USA, Inc. v. Santa Clara County, in which the Supreme Court held that plaintiffs could not sue on a form contract implementing a statute when the statute itself provided no private right of action. - U.S. -, 131 S.Ct. 1342, 1345, 179 L.Ed.2d 457 (2011) (applying § 340B of the Public Health Services Act, which imposes ceilings on prices drug manufacturers may charge for medications sold to healthcare facilities). But, as discussed above, the Supreme Court in Crane allowed enforcement of the SAAs through state-law claims even when there was no private right of action. See supra pp. 661-62 (discussing Crane and the SAAs). Furthermore, Astra is distinguishable as it involved “form agreements” that “simply incorporate[d] statutory obligations and record[ed] the manufacturers' agreement to abide by them” but “contain[ed] no negotiable terms.” Id. at 1348. Here, the contracts at issue involved negotiated duties *668 voluntarily assumed by the parties that, Canadian Pacific alleges, explicitly required LIA-compliant seats.

. The District Court erroneously relied on cases holding that breach-of-contract claims were preempted under the Carmack Amendment. The Carmack Amendment is a comprehensive federal regulatory scheme pertaining to interstate carrier liability for loss or damage to shipments. Certain Underwriters at Interest at Lloyds of London v. United Parcel Serv. of Am., Inc., 762 F.3d 332, 334 (3d Cir.2014) ("Congress first comprehensively addressed interstate carrier liability in the Carmack Amendment.Those cases are readily distinguishable because, unlike the LIA, the Carmack Amendment provides a federal private right of action. Id. ("Shippers may bring a federal private cause of action directly under the Carmack Amendment against a carrier for damages.”).