Daniel P. DUNCAN, Plaintiff–Appellant,

v.

STATE OF WISCONSIN DEPARTMENT OF HEALTH AND FAMILY SERVICES, et al., Defendants–Appellees.

No. 97–2198.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 23, 1998.

Decided Feb. 3, 1999.

Richard L. Bolton (argued), Boardman, Suhr, Curry & Field, Madison, WI, for Plaintiff–Appellant.

James E. Doyle, Office of the Attorney General, Richard Briles Moriarty (argued), Wisconsin Dept. of Justice, Madison, WI, for Defendants–Appellees.

Before BAUER, KANNE, and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

Daniel Duncan worked for almost two years as a youth counselor at the Ethan Allen School, a correctional facility for young males operated by the Wisconsin Department of Health and Family Services (DHFS). His job came to an end, however, two months after an incident in which one of his young charges complained that he had been verbally abusive. The incident itself prompted Ethan Allen officials to order Duncan to submit to various psychological tests at the state's expense. He completed some, but not all, of the program the psychiatrist recommended for him. After he missed several meetings with counselors and Ethan Allen officials, he was fired. He responded with this lawsuit, which alleged violations of the Rehabilitation Act of 1973, the Americans with Disabilities Act, and various deprivations of constitutional rights cognizable under 42 U.S.C. § 1983. Through a combination of rulings on summary judgment and a judgment as a matter of law at trial, the district court ruled in the defendants' favor on all points. Finding no error in its conclusions, we affirm.

## I

Duncan began working at Ethan Allen in April 1993. Working with boys and young men who had been found to be youth offenders, he was required to enforce the facility's rules. It was also expected that he would serve as a role model, and Duncan tried to do so. His task was particularly difficult because he was assigned to Unit 6, which housed the most violent, temperamental wards. Apart from some minor problems with absenteeism and tardiness, Duncan's work record up until March 1995 was a good one.

On March 5, 1995, all that changed when a youth named Erick Eaves complained to Pat Smith, Duncan's supervisor, that Duncan had been verbally abusive to him that day. One witness testified that Duncan had "really lost it," threatened to "kick ass," and called Eaves "punk ass bitch." Duncan took issue with that description and claimed that he just called Eaves a "punk." Smith decided to investigate the matter, and, following standard procedure, she transferred Duncan from Unit 6 to Draper Hall, effective March 6, pending the outcome of her investigation. Duncan was very angry both about the investigation and about the transfer. Draper Hall was known as a gang-dominated unit, and at the time of Duncan's assignment there, it was under a lock-down. Duncan again lost his temper before beginning his shift at Draper. He worked there most of the day on March 6, but he left early.

Duncan had the day off on both March 7 and March 8, and when he reported for duty on March 9, he learned that the Eaves investigation was slowly moving forward. Another supervisor, Jim Bell, reported that when Duncan read the notice scheduling an interview for the next day, Duncan became furious, throwing papers on the floor, glaring balefully at others, and perhaps kicking a chair or a locker. Duncan concedes that he was upset and that he told Bell that the complaint against him was "bullshit."

Troubled by Duncan's angry reaction to the Eaves investigation, Ethan Allen officials suspended him with pay on March 10 after an *ex parte* meeting with Smith. On March 22, Duncan received a letter from them that ordered him to submit to psychological and alcohol abuse testing at the state's expense the following week. Duncan reluctantly complied, even though he showed up for his meeting with the psychiatrist late and left early, which necessitated a second session. On April 10, the psychiatrist issued his report on Duncan, in which he concluded that Duncan did not have a psychological disability, nor did he pose a threat to himself or others. On the other hand, the psychiatrist went on, Duncan was subject to episodic "temper outbursts" that posed "serious limitations" on his ability to be a youth counselor. The psychiatrist recommended that Duncan learn "anger control skills" before returning to work. Duncan requested and received a copy of this report in early May, and on May 2, he met with Smith for an "investigatory interview." She chastised him for using inappropriate language with Eaves and advised him not to let the wards "press his buttons and get under his skin."

Duncan thought that this verbal warning closed the incident, but he was wrong. He remained on leave with pay as of Friday, May 12. On that date, Duncan and a union representative met with Ethan Allen officials to find out when he could return to work. Management informed him that he could not return until he successfully completed the recommended treatment for "anger management" and alcohol use. Until then, his suspension would be changed to one without pay. They also told him that he would have to agree to allow Ethan Allen to communicate freely with his treatment providers to verify his progress and satisfactory participation. Last, they told him that even though the "goal was to return him to work," he would be terminated if he stopped treatment without their consent.

Duncan found all of this profoundly offensive. He especially objected to the requirement that he see a certain alcohol counselor. The Ethan Allen officials agreed to meet after the weekend, on May 15, to discuss finding another alcohol counselor and to have Duncan sign the medical information releases. They remained firm in their decision to require him to submit to treatment.

Duncan never showed up on Monday, May 15, to sign the medical releases. Ethan Allen rescheduled, but Duncan again refused to show up, to sign the medical releases, or to undergo the recommended counseling. On May 23, Ethan Allen sent Duncan a letter with a final opportunity to sign the releases. Duncan asked for and received an extension to June 1, but the communication granting his request also warned him that this was his last chance. He would be fired, it said, if he were late, if he left early, or if he refused to sign the documents at that meeting. Pushing his luck, Duncan nonetheless missed the June 1 meeting, and on June 20, Ethan Allen notified him in writing of a pre-discharge hearing. Duncan does not contest the fact that he received notice of this hearing, but he testified that he could not recall what happened there or whether he was represented by counsel. On July 18, Ethan Allen notified Duncan that he had been finally terminated for insubordination, based on his refusal to undertake the required course of treatment and his history of absenteeism and tardiness.

## II

Duncan's suit named as defendants DHFS itself; Jean J. Schneider, the Superintendent of Ethan Allen School; Byron Barton, the School's Assistant Superintendent; several Ethan Allen employees (including Pat Smith, his supervisor); Muriel Harper, the Employee Assistance Director of DHFS; Richard Lorang, Acting Secretary and then Deputy Secretary of DHFS; and Michael Sullivan, the Secretary of the Wisconsin Department of Corrections. The defendants collectively filed a motion to dismiss, claiming that the Eleventh Amendment barred the suit against DHFS and against the state officials acting in their official capacity, and that the state officials were entitled to qualified immunity for the individual capacity claims. They made the same arguments in a contemporaneous motion for summary judgment.

In an order dated March 12, 1997, the district court denied the defendants' motion

to dismiss, granted their motion for summary judgment with respect to Duncan's claim that they had, acting in their individual capacity, violated his liberty interest in avoiding psychological treatment and his privacy interest in preventing release of his psychological records, and denied their motion for summary judgment with respect to Duncan's statutory claims under the ADA and the Rehabilitation Act and his constitutional claim of a deprivation of his property interest in employment without due process. The court also concluded that because Duncan seemed to not be pursuing § 1983 claims against DHFS or such claims against DHFS officials in their official capacity for retrospective monetary relief, the Eleventh Amendment was somewhat beside the point and did not require dismissal. The case then went to trial on two issues: (1) whether DHFS violated either the Rehabilitation Act or the ADA when it discharged Duncan; and (2) whether any of the individual defendants unconstitutionally deprived him of a property interest without due process when they discharged him. The trial was cut short, however, after Duncan rested his case during the liability phase. At that point, the defendants moved for judgment as a matter of law under Rule 50, and the district court granted their motion and dismissed the action, rejecting Duncan's Rule 59 motion for a new trial along the way. This appeal followed.

### III

■ We begin with a brief word about the scope of this appeal. Duncan's notice of appeal indicates that he was appealing both from the district court's denial of his Rule 59 motion and from the court's April 3, 1997, entry of final judgment "on all of plaintiff's claims." As far as it goes, this language easily suffices to bring before this court not only the district court's rulings on the Rule 50 and Rule 59 trial motions, but also the earlier summary judgment rulings. See, e.g., *Kunik v. Racine County, Wis.*, 106 F.3d 168, 172 (7th Cir.1997). It is also true, however, that a party must develop any arguments it wishes this court to consider in its appellate brief, or they will be deemed waived or abandoned. See *Pitsonbarger v. Gramley*, 141 F.3d 728, 738 (7th Cir.1998); Fed. R.App. P.

28(a)(6). The state argues that the only points Duncan presented in his opening brief on appeal related to the trial rulings, and thus he has waived any challenge to the district court's summary judgment rulings. We agree that his appellate brief is devoid of discussion of the following points, which we will not consider beyond identifying them here: (1) the district court's characterization of Duncan's claims under 42 U.S.C. § 1983 as seeking neither monetary relief against the individual defendants in their official capacity, nor any kind of relief against DHFS itself; (2) the district court's decision that the defendants were entitled to qualified immunity on Duncan's claim that their insistence that he undergo psychological treatment as a condition of maintaining his employment violated a Fourteenth Amendment liberty interest in refusing unwanted medical treatment; and (3) the district court's ruling that the defendants were entitled to qualified immunity on Duncan's claim that they violated his Fourteenth Amendment privacy (or liberty) interest in keeping his medical information confidential when they ordered him to agree to release information about his alcohol and anger treatment regime to them or face the possibility of discharge.

■ Although Duncan's brief contains some discussion of the merits of the latter two issues, it never so much as cites *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), or any other case addressing the doctrine of qualified immunity. This is not enough to join issue with the district court's decision. Moreover, this failure to cite relevant precedent betrays an inability to show that the state officials violated a clearly established rule of constitutional law, as is required by *Harlow* and *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). This is not one of those egregious cases, like pointing a gun to the head of a child, see *McDonald by McDonald v. Haskins*, 966 F.2d 292 (7th Cir.1992), or asserting a right to push people around for no reason, see *Clash v. Beatty*, 77 F.3d 1045 (7th Cir.1996), where the lack of precedent might be excused. With respect to the DHFS and official capacity claims, even if the district court was

wrong to assume that Duncan had abandoned them, it is plain in any event that neither the state agency itself nor the state employees in their official capacity can be sued for retrospective monetary relief, for the simple reason that the state is not a "person" for purposes of 42 U.S.C. § 1983. See *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 64–71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). We thus take the case as one presenting only the following questions: (1) did Duncan present enough evidence to reach the jury on his claims under the ADA and the Rehabilitation Act, and (2) did he present enough evidence to reach the jury on his claim that he was discharged in violation of his Fourteenth Amendment right to procedural due process.

### A. ADA and Rehabilitation Act

As the district court noted, there is no material difference between the scope of the ADA and that of the Rehabilitation Act for present purposes. Like that court, we will therefore discuss the two theories together, referring interchangeably to precedents under both statutes. The ADA prohibits discrimination against "a qualified individual with a disability because of the disability . . . ." 42 U.S.C. § 12112(a). The first hurdle a plaintiff must pass, and the one that is insurmountable for Duncan, is the requirement that the plaintiff must be "disabled." Under the ADA, a plaintiff may prove disability by showing one of three things: (1) "a physical or mental impairment that substantially limits one or more of the major life activities" of the individual, (2) "a record of such impairment," or (3) "being regarded as having such an impairment." 42 U.S.C. § 12101(2). Duncan concedes that he does not fit the first two categories; he has put all his eggs in the "regarded as" basket. He claims that the record at trial contained evidence that the Ethan Allen officials perceived him as mentally disabled, and thus it was error to grant judgment as a matter of law against him on his statutory claims.

As we have often had occasion to remark, not every disability—actual or perceived—triggers statutory protection. Instead, as the law specifies, the disability must be one that "substantially limits" a major life activity. 42 U.S.C. § 12102(2); *Baulos v. Roadway Express, Inc.*, 139 F.3d 1147, 1151–52 (7th Cir.1998). The only major life activity to which Duncan alludes is the activity of working; he makes no claim that the Ethan Allen officials believed that his temper made it difficult for him to walk, breathe, lift, or carry on any other "major" life activity. But even if the Ethan Allen officials thought that Duncan was ill-suited to the job of youth counselor because he had a personality disorder, that would demonstrate only that he had trouble at one specific job—a showing of disability that we have specifically found to be inadequate under both the Rehabilitation Act and the ADA. See, *e.g., Knapp v. Northwestern Univ.*, 101 F.3d 473, 480–81 (7th Cir.1996) (Rehabilitation Act); *Best v. Shell Oil Co.*, 107 F.3d 544, 548 (7th Cir.1997) (ADA); *Baulos*, 139 F.3d at 1151(ADA); *Homeyer v. Stanley Tulchin Assocs., Inc.*, 91 F.3d 959, 961 (7th Cir.1996)(ADA). See also 29 C.F.R. § 1630.2(j)(3)(i) (ADA). Duncan instead had to introduce some evidence indicating that the Ethan Allen officials thought he had an impairment that would have disqualified him from a broader category of jobs. The evidence at trial pointed in exactly the opposite direction. When the problems arose in Unit 6, the Ethan Allen officials responded by transferring Duncan to Draper Hall, indicating that they believed he could work successfully in a slightly different environment. We agree with the district court that Duncan failed to present evidence that would have justified a jury's finding that he was perceived to suffer from a "disability" within the meaning of the two laws. Furthermore, even if Duncan's propensity to lose his temper counted as a statutory disability, our decision in *Palmer v. Circuit Court of Cook County*, 117 F.3d 351 (7th Cir.1997), suggests that the ADA and Rehabilitation Act claims would founder on the qualifications requirement. We therefore have no occasion to reach the defendants' alternative arguments in support of the judgment, including their assertion that Duncan could prevail only if he could show that his perceived disability was the *sole* reason he was terminated as opposed to a "but for" cause.

### B. *Procedural Due Process*

Everyone agrees that Duncan had a protected property interest in his position at DHFS, under the applicable Wisconsin statutes. *Fittshur v. Village of Menomonee Falls*, 31 F.3d 1401, 1405 (7th Cir.1994) (employees that can only be discharged for cause have protected property interest); Wis. Stat. Ann. § 230.34(1) (employees in Duncan's position may be fired only for just cause). (We note in passing that both parties have assumed that this provision covers Duncan. This may or may not be correct. Duncan appears to be in a union, and Wisconsin law, Wis. Stat. Ann. § 230.34(1)(ar), provides that the standards for just cause and appellate procedures for unionized employees are governed by the collective bargaining agreement. Because neither party has made an issue of it, we proceed as if Duncan's property interest is at least equivalent to that provided by § 230.34(1).) The crucial question is whether the state deprived him of that property interest without adequate procedural protections, when it took the steps that eventually resulted in his dismissal. As our account of the facts above made clear, Duncan had numerous opportunities to learn about both the infraction he allegedly committed and the deficiencies the Ethan Allen officials perceived in his job performance. He also had repeated opportunities to communicate his side of the story to them. That he may have found Ethan Allen's actions unwarranted or offensive is, in the final analysis, a substantive complaint, not a procedural one. As we recently had occasion to observe in *Dunn v. Fairfield Community High Sch. Dist. No. 225*, 158 F.3d 962, 964–65 (7th Cir.1998), there is an important difference between the procedural and the substantive components of the Fourteenth Amendment's due process clause.

■ Three Supreme Court decisions provide the starting point for our analysis of Duncan's procedural due process argument: *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); and *Gilbert v. Homar*, 520 U.S. 924, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997). In *Mathews v. Eldridge*, the Court wrote that "[t]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." 424 U.S. at 333, 96 S.Ct. 893 (internal quotations omitted). The specific procedures appropriate to a given situation vary, depending on three distinct factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335, 96 S.Ct. 893.

■ In *Loudermill*, the Court applied the *Eldridge* framework to the specific question of what kind of pretermination process the due process clause guarantees to a public employee who can be discharged only for cause. 470 U.S. at 542–43, 105 S.Ct. 1487. There the Court held that such an employee was entitled to at least an abbreviated pretermination "hearing" (a word the Court itself put in quotations, see *id.* at 545, 105 S.Ct. 1487). It concluded that "[t]he tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Id.* at 546, 105 S.Ct. 1487. These abbreviated procedures were appropriate, the Court made clear, only when the state also gave the employee a right to a full post-termination hearing. *Id.*

■ Insofar as Duncan has focused his complaint on his discharge, the *Loudermill* criteria govern and demonstrate that Duncan received all the process he was due. He was given both oral and written notice of the charges against him; representatives of the employer explained their concerns to him on several occasions; and he had repeated chances to give his side of the story (some of which he used). The record indicates that he even had a formal pre-discharge hearing on June 26, 1995. Wisconsin also makes avail-

able to discharged public employees a full-blown post-discharge proceeding, under Wis. Stat. Ann. § 230.44(1)(c). Under *Loudermill*, this is easily enough.

To the extent Duncan may also be complaining about his two suspensions, the undisputed facts do not hint at a procedural due process failing. On March 10, he was suspended with pay, after he had been informed that the Ethan Allen officials were concerned about the March 5 incident and wanted time to investigate it. A suspension *with* pay does not result in a deprivation of property sufficient to trigger due process protections. Wis. Stat. Ann. § 230.34(1)(a) (cause required only for a suspension without pay). As of May 12, however, the suspension was converted into one *without* pay—a situation addressed by the Supreme Court in *Gilbert*, and by this court in *Ibarra v. Martin*, 143 F.3d 286, 289 (7th Cir.1998). In *Gilbert*, a case where the cause prompting the suspension was the filing of a criminal complaint against the employee, the Court held that as long as the employee receives a sufficiently prompt and thorough post-suspension hearing, his interest in the continuation of his paycheck and benefits is relatively insubstantial. 117 S.Ct. at 1813–14. Importantly, before coming to that conclusion, the Court carefully weighed the state's interests in taking prompt action. *Id.* at 1813. We find the situation before us to be closely analogous to the one in *Gilbert*: there, the state was vindicating an interest to have only persons of high integrity on the police force; here, the state is trying to employ only individuals who can control their anger and keep a level head working with youthful offenders. In short, the process Duncan received during the period of his suspension without pay complied with the standards set out in *Gilbert*.

We have considered the other arguments Duncan has made as well, and they do not persuade us that his rights under either the Constitution or federal law have been violated. We therefore AFFIRM the judgment of the district court.