In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-2150

RONALD WARD,

*Plaintiff-Appellant,*

*v.*

SOO LINE RAILROAD COMPANY,
doing business as CANADIAN PACIFIC, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 14-CV-00001 — **Rudy Lozano**, *Judge.*

ARGUED MAY 16, 2018 — DECIDED AUGUST 27, 2018

Before FLAUM, SYKES, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Ronald Ward injured his shoulder and back when his seat collapsed in the train he was operating. Ward is a U.S. resident who is employed by a U.S. railroad. Normally, these facts could give rise to a lawsuit under the Federal Employers' Liability Act (FELA), 45 U.S.C. § 51 et seq. Because Ward's seat collapsed across the border in Ontario, however, the FELA does not apply. Instead, Ward

pursued his tort claims under state common law. Ruling on the defendants' motions to dismiss and for judgment on the pleadings for failure to state a claim, the district court rejected Ward's claims by holding that another federal law, the Locomotive Boiler Inspection Act (LIA), 49 U.S.C. § 20701 et seq., preempted all state tort law remedies for injuries caused by locomotive equipment.

We see the case differently on the merits of the preemption defense, but we ultimately affirm the judgment. The federal railroad-safety statutes left plaintiff one path that is viable and not preempted: He could assert state-law tort claims against the defendants that borrow the applicable standards of care from the federal LIA and its regulations governing the safety of locomotive equipment. This is a well-established path for fitting state and federal law together. See *Delaware & Hudson Railway Co., Inc. v. Knoedler Manufacturers, Inc.*, 781 F.3d 656, 662 (3d Cir. 2015) (LIA does not preempt state common-law claims seeking to redress violations of federal standard of care mandated by LIA and its regulations). Plaintiff pursued this viable theory in the district court, but in pursuing his appeal, he has waived any claim based on this theory.

The district court dismissed Ward's claims on the pleadings, so we review its decisions *de novo*, giving Ward the benefit of all well-pleaded factual allegations in his complaints and reasonable inferences from them. See, e.g., *Matrix IV, Inc. v. American Nat'l Bank and Trust Co. of Chicago*, 649 F.3d 539, 547 (7th Cir. 2011). To explain our decision, we examine in Part I the relevant federal statutes and the precedents governing their relationships with state tort law. In Part II, we turn to the merits of the district court's judgment, explaining why the court erred in part on the scope of the preemption defense

and why plaintiffs in Ward's position should be allowed to pursue the one viable path open to them. Finally, in Part III, we turn to the procedural history of this lawsuit and address defendants' arguments that Ward waived that one viable path.

I.   *Remedies for Injured Railroad Workers*

   A.  *The Common Law Before the Federal Statutes*

Before Congress passed the FELA in 1908, injured railroad workers brought common-law tort actions in state or federal courts to recover for their injuries. See, e.g., *Texas & Pacific Railway Co. v. Cox*, 145 U.S. 593, 604–06 (1892) (recognizing ability of Texas courts to provide relief under Louisiana's wrongful death statute for an injury occurring in Louisiana); *Dennick v. Railroad Co. of New Jersey*, 103 U.S. 11, 18 (1880) (recognizing that "[a] party legally liable [for a transitory tort] in New Jersey cannot escape that liability by going to New York").

Under principles prevailing at the time, the Supreme Court required federal courts hearing these common-law tort cases to apply the rule of *lex loci delicti*, meaning that the substantive law applied in any given case was the law of the state where the plaintiff's injury occurred. *Slater v. Mexican Nat'l Railroad Co.*, 194 U.S. 120, 126 (1904). Given the interstate and international nature of railroad employment, the nineteenth-century laws of different states—not to mention the laws of Canada and Mexico—posed obstacles not only for litigants but also for courts determining which law to apply and how to apply it. These problems landed on the Supreme Court docket with some regularity, so the Court developed a general federal common law on these matters in the era predating

*Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), which elimi-nated the federal general common law and instructed federal courts hearing state law claims to apply state law as deter-mined by the relevant state courts. See *Slater*, 194 U.S. at 121 (choice of law between Texas and Mexico); *Stewart v. Baltimore & Ohio Railroad Co.*, 168 U.S. 445, 448-49 (1897) (between Mar-yland and District of Columbia); *Texas & Pacific Railway Co.*, 145 U.S. at 603 (between Texas and Louisiana); *Dennick*, 103 U.S. at 18 (between New York and New Jersey).

B.  *The Federal Employers' Liability Act (FELA)*

In 1908, Congress enacted the FELA, 45 U.S.C. § 51 et seq., which created a uniform law to govern injuries to railroad workers in the United States. Under the FELA, all railroad in-juries are treated as negligence actions that apply a federal standard of care. § 51; *New York Central Railroad Co. v. Winfield*, 244 U.S. 147, 150–51 (1917). The FELA also replaced or abol-ished certain defenses that might bar recovery under the com-mon law. For example, the FELA allows recovery for wrong-ful death, which previously had been recognized only hap-hazardly under a patchwork of common-law rules and stat-utes. See *Dennick,* 103 U.S. at 21 ("The right to recover for an injury to the person, resulting in death, is of very recent origin, and depends wholly upon statutes of the different States.").

Among its substantive changes to tort law, the FELA also bars employers from asserting as an absolute defense that the employee-plaintiff "assumed the risks of his employment," § 54, or that an employer should not be held liable for injuries resulting from the negligence of an injured employee-plain-tiff's co-workers, §§ 51, 52. The FELA also replaces contribu-tory negligence as an absolute defense with a comparative

negligence regime under which a plaintiff-employee's damages are reduced "in proportion to the amount of negligence attributable to such employee." § 53. And the FELA provides even greater protection where the plaintiff proves that a railroad company's violation of any statute or regulation "enacted for the safety of employees contributed to the injury or death." *Id.* In those cases, the company is liable for the full amount of loss, notwithstanding the injured worker's negligence. §§ 53, 54.

To enforce the FELA, Congress relied upon both state and federal courts, granting concurrent jurisdiction to both. Two years after enacting the FELA, Congress mandated that a plaintiff's choice of forum would control. Congress amended the FELA to bar removal of FELA actions from state court to federal court. FELA Amendments, Pub. L. No. 117, 36 Stat. 291 (1910). The substance of that removal bar is now codified in 28 U.S.C. § 1445(a).

From the beginning of the FELA era, then, Congress envisioned a robust role for the states and their courts in vindicating the federal rights of injured railroad workers. Since the FELA did not mandate specific procedural rules, state courts hearing FELA actions may follow their own rules of procedure but must take care that these requirements do not burden a plaintiff's federal rights under the Act. See, e.g., *Dice v. Akron, Canton & Youngstown Railroad Co.*, 342 U.S. 359, 363 (1952) ("the right to trial by jury is too substantial a part of the rights accorded by the Act to permit it to be classified as a mere 'local rule of procedure'"); *Brown v. Western Railway of Alabama*, 338 U.S. 294, 298 (1949) ("Strict local rules of pleading cannot be used to impose unnecessary burdens upon rights of recovery authorized by federal laws."); *Minneapolis*

*& St. Louis Railroad Co. v. Bombolis*, 241 U.S. 211, 218 (1916)
(recognizing the "concurrent power and duty of both Federal
and state courts to administer the rights conferred by the stat-
ute in accordance with the modes of procedure prevailing in
such courts").

C. *The Locomotive Boiler Inspection Act (LIA)*

In 1911, Congress followed the FELA by passing the Loco-
motive Boiler Inspection Act (LIA), 49 U.S.C. § 20701 et seq.,
which regulates the safety of locomotive equipment. Like the
FELA, the LIA provided a national solution to a legal problem
posed by railroads—this time displacing states' haphazard
safety regulations of locomotive equipment with a uniform
federal law. The LIA provides:

> A railroad carrier may use or allow to be used a
> locomotive or tender on its railroad line only
> when the locomotive or tender and its parts and
> appurtenances—
>
> > (1) are in proper condition and safe to oper-
> > ate without unnecessary danger of personal
> > injury;
> >
> > (2) have been inspected as required under
> > this chapter and regulations prescribed by
> > the Secretary of Transportation under this
> > chapter; and
> >
> > (3) can withstand every test prescribed by
> > the Secretary under this chapter.

49 U.S.C. § 20701. The LIA "imposes upon the carrier a higher
degree of duty than theretofore existed" at common law, re-
quiring the railroad to ensure locomotive equipment is "in

proper condition and safe to operate." *Baltimore & Ohio Rail-road Co. v. Groeger*, 266 U.S. 521, 523, 527 (1925).

This federal duty of care preempts all comparable state law standards of care in the field of locomotive safety. In *Napier v. Atlantic Coast Line Railroad Co.*, the Supreme Court held that Congress meant for the LIA to "occupy the field" for "regulating locomotive equipment … so as to preclude state legislation." 272 U.S. 605, 613, 607 (1926). In 2012, the Court followed *Napier*, affirming that "state common-law duties and standards of care directed to the subject of locomotive equipment are pre-empted by the LIA." *Kurns v. Railroad Friction Products Corp.*, 565 U.S. 625, 637 (2012) (holding state-law claims of defective design and failure to warn preempted under LIA). Under *Napier* and *Kurns*, then, state regulation of locomotive equipment cannot diverge from the standards of care mandated by the LIA, and state courts must take care to prevent independent state policy from interfering with federal policy on the regulation of locomotive equipment. See *id.*

The LIA, coming as it did on the heels of the FELA, "was passed to promote the safety of employees and is to be read and applied with the Federal Employers' Liability Act." *Groeger*, 266 U.S. at 528. The LIA's standards are enforced by the Secretary of Transportation through regulatory actions, as well as through private negligence lawsuits. In most circumstances, these lawsuits are FELA actions alleging negligence *per se* in state or federal courts because the LIA is exactly the type of statute "enacted for the safety of employees" contemplated by sections 53 and 54 of FELA. See *Lilly v. Grand Trunk Western Railroad Co.*, 317 U.S. 481, 485–86 (1943) (applying Boiler Inspection Act, which addressed matters now covered

by LIA); *Southern Railway Co. v. Lunsford*, 297 U.S. 398, 401 (1936).

In this case, the FELA does not apply because the accident occurred in Canada, and the FELA has long been held not to apply to accidents outside the United States. *New York Central Railroad Co. v. Chisholm*, 268 U.S. 29, 32 (1925). But that limit on the civil remedy under the FELA does not bar a plaintiff who is *not* covered by the FELA from relying on the LIA to establish the standard of care that applied to the defendants as part of a *state*-law tort claim. This situation seems to arise far less often than FELA claims by railroad employees, but this use of the LIA in state-law tort claims where the FELA does not apply is an established one.

For example, in *Scott v. Chicago, Rock Island & Pacific Railroad Co.*, 197 F.2d 259 (8th Cir. 1952), the Eighth Circuit considered the LIA's relevance in a state-law negligence suit by the passenger of a vehicle who was injured after being hit by a locomotive. A warning device on the locomotive was in disrepair "such as to show a violation of the Locomotive Boiler Inspection Act," which was "undisputed evidence of defendant's negligence." *Id.* at 261. The plaintiff could not bring a FELA action, of course, since she was not employed by the railroad. The Eighth Circuit held that the railroad could be held liable in negligence for violating the federal standard of care imposed by the LIA, noting that the "this Act has been held not merely for the protection of railroad employees but also to promote the safety of passengers and the public generally." *Id.* (ordering new trial for plaintiff with claim under Iowa tort law where district court erred in holding plaintiff contributorily negligent).

More recently, the Third Circuit similarly held that Pennsylvania state tort law provided a vehicle for vindicating the LIA's standard of care in *Delaware & Hudson Railway Co., Inc. v. Knoedler Manufacturers, Inc.*, 781 F.3d 656 (2015). That case considered essentially the same preemption defense we confront here and concerned similar facts, including even defective locomotive seats made by the same manufacturer sued in this case. In *Delaware & Hudson*, the railroad had settled lawsuits brought by its employees who had been injured by defective seats. *Id.* at 658. To help pay those settlements, the railroad sued the manufacturer of the seats and another company it had paid to repair the defective seats. *Id.* at 659. The plaintiff railroad sued under a variety of state-law theories, including contribution. *Id.* at 660. As here, the defendants argued under *Kurns* and *Napier* that the railroad's claims based on allegations of negligence were preempted by the LIA.

The Third Circuit disagreed, pointing to a variety of contexts where the Supreme Court has held "that violations of federal law can be redressed through state common-law claims." *Id.* Judge Jordan's opinion for the court pointed convincingly to the Safety Appliance Acts, statutes passed years before the LIA and FELA to promote safety in the railroad industry by mandating the installation of certain safety equipment on locomotives. The court quoted Supreme Court decisions interpreting those Acts and stating that a person who was injured by violations of the Acts but who could not seek a remedy under the FELA "must look for his remedy to a common law action in tort, which is to say he must sue in a state court, in the absence of diversity, to implement a state cause of action," since the Acts "do not give a right of action for their breach, but leave the genesis and regulation of such action to the law of the states." *Id.* at 663, quoting first *Crane v. Cedar*

*Rapids & Iowa City Railway Co.*, 395 U.S. 164, 166 (1969), and then *Tipton v. Atchison, Topeka & Santa Fe Railway Co.*, 298 U.S. 141, 147–48 (1936).

The Third Circuit also drew on the Supreme Court's parallel recognition of state law claims for violations of the Atomic Energy Act in *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238 (1984). *Delaware & Hudson*, 781 F.3d at 662. That same logic applies to the use of state tort law to vindicate duties imposed by the federal Medical Device Amendments of 1976 and the Federal Cigarette Labeling and Advertising Act of 1965. See *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486-91 (1996); *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 524-30 (1992). The list, no doubt, could go on to encompass other fields where federal law sets standards for health and safety, but does not provide a private right of action under federal law itself.

II. *Applying the Law to This Case*

   A. *Current Preemption Doctrine Under the FELA & LIA*

As this historical overview suggests, Congress imposed duties under the LIA and the FELA that both state and federal courts can enforce. By the FELA's express terms, Congress entrusted state courts with the power to vindicate federal policy, including the LIA, through negligence actions. Although those statutes are silent on the ability to enforce the LIA's standards of care outside an FELA action, the use of state-law causes of action to enforce federal safety standards is a familiar feature of tort law in our federal system and in Indiana law.

The Supreme Court explained this point in *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308 (2005). The Court said that "garden variety state tort

law" claims that borrow standards of care from federal law are so numerous that they cannot be deemed subject to federal question jurisdiction: "The violation of federal statutes and regulations is commonly given negligence *per se* effect in state tort proceedings." *Id.* at 318–19, quoting Restatement (Third) of Torts § 14 cmt. a (Tent. Draft No. 1, March 28, 2001), and citing W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 36, p. 221, n.9 (5th ed. 1984) ("the breach of a federal statute may support a negligence per se claim as a matter of state law"); see also Restatement (Third) of Torts: Prod. Liab. § 4 (1998) ("In connection with liability for defective design or inadequate instructions or warnings: (a) a product's noncompliance with an applicable product safety statute or administrative regulation renders the product defective with respect to the risks sought to be reduced by the statute or regulation. . . .").

State courts often take this approach. In Indiana, for example, see *Erwin v. Roe*, 928 N.E.2d 609, 620 (Ind. App. 2010) ("[W]e hold that … violation of the [Residential Lead-based Paint Reduction Act] is given negligence *per se* effect in Indiana tort proceedings."); *Santini v. Consolidated Rail Corp.*, 505 N.E.2d 832, 838 n.4 (Ind. App. 1987) (holding that local ordinances regulating speed of trains are preempted, but recognizing ability of injured plaintiffs to "allege[] that violation of a federal speed regulation" for locomotives "was negligence per se").

The LIA's enforcement scheme fits well with modern preemption jurisprudence that acknowledges a role for state law causes of action to vindicate federal policy in statutes such as the Atomic Energy Act and the Medical Device Amendments. See *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 330

(2008) (federal preemption under the Medical Device Amendments "does not prevent a State from providing a damages remedy for claims premised on a violation of FDA regulations"); *Silkwood*, 464 U.S. at 256 ("Congress assumed that state-law remedies … were available to those injured by nuclear incidents. This was so even though it was well aware of the NRC's exclusive authority to regulate safety matters."); see also *Engvall v. Soo Line Railroad Co.*, 632 N.W.2d 560, 569–70 (Minn. 2001) (allowing Soo Line to pursue state-law cause of action based on violation of federal safety standard in LIA). There is, however, a critical line that states cannot cross where federal safety standards of care preempt state law: states may *borrow* federal standards of care, but they may not *substitute or add* their own standards of care.

This same line of reasoning is evident in the Supreme Court's decisions applying the federal Safety Appliance Acts, which also regulate train safety. 49 U.S.C. § 20301 et seq. In *Tipton v. Atchison, Topeka & Santa Fe Railway Co.*, the Supreme Court held that although "the Safety Appliance Acts do not give a right of action for their breach," the states were "at liberty to afford any appropriate remedy for breach of the duty imposed by the Safety Appliance Acts." 298 U.S. at 147-48. The Court had previously recognized in *Moore v. Chesapeake & Ohio Railway Co.*, that the Safety Appliance Acts "prescribed duties" from which "injured employees are entitled to recover for injuries sustained through the breach of these duties," but that this "right to recover damages sustained by the injured employee through the breach of duty sprang from the principle of the common law[.]" 291 U.S. 205, 214-15 (1934); see also *Breisch v. Central Railroad of New Jersey*, 312 U.S. 484, 486 (1941) (recognizing again that state law allowed a railroad employee

to sue under state law for violations of the Safety Appliance Acts).

We see no reason to depart from these general principles or the specific applications under the LIA by the Third Circuit in *Delaware & Hudson* and the Eighth Circuit in *Scott*. Nor do we see a good reason to conclude that the LIA creates an odd exception to enforcement regimes that have vindicated federal policy in various fields of safety and health regulation, recognizing a robust role for state law in remedying the breach of federal safety policies, including those for railroads.

In this case, the defendants argued, and the district court concluded, that state courts can apply the LIA standards of care *only* in FELA actions. The mistaken logic runs like this: *Napier* and *Kurns* both determined that the LIA occupies the field of locomotive regulation, preempting any state regulation in this area. *Napier*, 272 U.S. at 613; *Kurns*, 565 U.S. at 637. In *Chisholm*, the Court held that the FELA does not apply extraterritorially, to injuries that occur outside the nation's borders. 268 U.S. at 32. In *Urie v. Thompson*, the Court recognized that the LIA does not create a private right of action arising under federal law. 337 U.S. 163, 188 (1949). Extrapolating from *Urie*, the defendants argued and the district court concluded that the LIA can be enforced only through federal agency action or through the FELA. *Ward v. Soo Line R.R. Co.*, No. 2:14-CV-00001, 2016 WL 3402772, at *4 (N.D. Ind. June 21, 2016). Without the FELA, the argument goes, state courts lack the authority to apply the LIA and cannot apply their own standards of care for injuries resulting from locomotive defects. *Id*.

This reasoning runs contrary to both the clear language of the Supreme Court's cases under the railroad statutes and the

parallel reasoning underlying the other federal safety statutes and regulations cited above.

In reaching this conclusion, we note the Court's language in *Kurns*: "state common-law duties and standards of care directed to the subject of locomotive equipment are preempted by the LIA." 565 U.S. at 637. Notably, the reference to "duties and standards of care" says nothing about preempting state law *causes of action* that borrow and enforce *federal* duties and standards of care, despite the *Kurns* defendants' explicit arguments against the use of state-law causes of action based on LIA violations. See Brief for Respondents at 9, *Kurns*, No. 10-879, 2011 WL 4590847 (Oct. 3, 2011). *Kurns* did not expressly authorize state-law causes of action borrowing standards of care from the LIA, but the facts in *Kurns* did not present the Supreme Court any opportunity to address the issue or to reconsider the cases and reasoning we rely upon here that endorse the ability of state law to borrow duties and standards of care from the LIA, the Safety Appliance Acts, and other similar federal safety statutes. We should not expand *Kurns* beyond its clear terms, particularly when the law has "long presumed that Congress does not cavalierly pre-empt state-law causes of action" "because the States are independent sovereigns in our federal system." *Medtronic*, 518 U.S. at 485.

The reasoning of *Kurns* and *Napier* thus does not support preemption of state law causes of action based on violations of federal standards. Both cases were limited to claims that defendants violated *state-law* standards of care. In *Kurns*, as in so many other cases involving LIA preemption, the plaintiff claimed that the defendants had been negligent by violating non-federal standards of care tied to the presence of, and lack of warning regarding, asbestos in locomotives—standards

that would have imposed additional duties on the defendants.[1] *Napier* also involved state law standards of care separate from and in addition to those imposed by federal law. In that case, the plaintiff's claims were based on two state regulations that mandated automatic doors to train fireboxes and cab curtains to protect engineers and firemen from the elements during the winter. *Napier*, 272 U.S. at 609–10. These regulations added to the requirements of the LIA and agency regulations concerning locomotives.

The Court determined, first in *Napier* and again in *Kurns*, that Congress meant to occupy the field of locomotive equipment regulation with the LIA so that railroads would not have to adjust their locomotive equipment every time they crossed a state boundary. See *id.* at 613. The appellate cases defendants rely upon here also involved similar preempted attempts to use state tort law to impose state regulation through standards of care different from and in addition to the LIA's duties. See *Oglesby v. Delaware & Hudson Railway Co.* 180 F.3d 458, 462 (2d Cir. 1999) (plaintiff claimed cab seat was designed defectively because it lacked warnings or instructional signs not required by LIA); *Law v. General Motors Corp.*, 114 F.3d 908,911 (9th Cir. 1997) (plaintiff argued that noise protection should have been provided beyond what was required under LIA and its regulations); *Forrester v. American Dieselelectric, Inc.*, 255 F.3d 1205, 1206–07 (9th Cir. 2001) (plaintiff claimed crane

---

[1] Although Kurns previously had brought an FELA claim based on a claimed violation of the LIA's standard of care, that claim was no longer part of the case by the time it reached the Supreme Court. See Brief of Petitioners at 12, *Kurns*, No. 10-879, 2011 WL 3608729 (Aug. 12, 2011).

needed additional audible warning system not required under LIA).

In contrast to those cases, Ward should need to establish here only that the defendants violated the LIA or its regulations and that he suffered injury as a proximate result. That is just what his complaint alleged. Paragraphs 9 and 10 of Count Two of the Second Amended Complaint alleged that defendant Soo Line violated LIA regulations, 49 C.F.R. §§ 229.119(a) and 229.45, by failing to provide a securely mounted and braced cab seat. Dkt. 28 at 7. Paragraph 11 alleged that the defective condition of the locomotive directly and proximately caused Ward's injury. *Id*. at 8. (Those allegations were contained in a count labeled "The Locomotive Inspection Act" rather than state law, but plaintiffs are not required to plead legal theories in their complaints. See Dkt. 28 at 7–8.) Ward's state-law cause of action proceeding under a negligence *per se* theory mirrored an FELA action in all respects important to maintaining uniform federal regulation. It differed only in that defendants might be able to use certain defenses that would be barred under the FELA. The presence of these defenses does not alter the duties and standards of care that apply to the defendants under the LIA. Under these circumstances, no harm to uniform federal locomotive regulation would arise through this case that would not already be present under a non-removable FELA lawsuit in state court.[2]

From the outset of the FELA era, the Supreme Court has made clear its expectation that tort suits under state law

---

[2] Ward's complaint also spoke at times about state-law standards of care. The LIA preempts Ward's claims based on state rather than federal standards of care.

would provide relief for injured people who are unable to pursue claims under the FELA itself. Concluding that the FELA had no extraterritorial application, the Supreme Court in *Chisholm* reasoned from its prior cases involving state-law enforcement of duties imposed by laws foreign to the forum state. 268 U.S. 31–32. The facts in *Chisholm* resemble those here. In that case, a railroad worker was injured (and ultimately killed) just north of the Canadian border. *Id.* at 30. In concluding that the FELA did not apply to the case, the Supreme Court drew on two long-established common-law principles, and the Court took for granted that these principles charted an alternative path to recovery under state or foreign law for railroad workers injured in locations beyond the reach of the FELA. *Id.* at 32.

The first principle was that persons and businesses were bound only by the duties and standards of care created by the jurisdiction in which they were located at any given time. This principle reinforced both the presumption against extraterritoriality as well as the traditional conflict-of-laws *lex loci delicti* rule, which directs courts to apply the substantive tort law of the place where an injury occurred. In *Chisholm*, the Court held that the "carrier was subject only to such obligations as were imposed by the laws and statutes where the alleged act of negligence occurred. . . ." *Id.* The *Chisholm* Court followed *Slater v. Mexican Nat'l Railroad Co.*, 194 U.S. 120 (1904), a pre-FELA, pre-*Erie Railroad* action brought in federal court after a U.S. citizen who worked for a U.S. railroad was injured in Mexico. In *Slater*, the Supreme Court acknowledged the ability of a federal court to adjudicate the case, but it restricted the action to apply only the Mexican-law standard of care. *Chisholm* quoted this language from *Slater*:

> [W]hen such a liability is enforced in a jurisdiction foreign to the place of the wrongful act, obviously that does not mean that the act in any degree is subject to the *lex fori*, with regard to either its quality or its consequences. On the other hand, it equally little means that the law of the place of the act is operative outside its own territory. The theory of the foreign suit is that although the act complained of was subject to no law having force in the forum, it gave rise to an obligation, an *obligatio*, which, like other obligations, follows the person and may be enforced wherever the person may be found. … But as the only source of this obligation is the law of the place of the act, it follows that the law determines not merely the existence of the obligation, … but equally determines its extent.

268 U.S. at 32, quoting *Slater*, 194 U.S. at 126 (citation omitted). This principle buttressed *Chisholm*'s statutory interpretation, but it also assumed the availability of the "foreign suit" for an injured worker not able to file FELA suits because the injury occurred in another nation: "The carrier was subject only to such obligations as were imposed by the laws and statutes of the country where the alleged act of negligence occurred . . . ." *Id.* at 32.

The Court's discussion of foreign obligations pointed to the second common-law principle in *Chisholm*—the "transitory torts" doctrine, which has its roots in English common law. Explicitly a rule of venue, this doctrine permitted any court in England to try suits arising from harms that were transitory in nature rather than tied to the locality where they

occurred. The main difference between transitory and local torts is that a harm to person or personal property is transitory in nature, so the locale of the occurrence is incidental to the injury, while harm to real property is tied to its locale. *McKenna v. Fisk*, 42 U.S. (1 How.) 241, 248-49 (1843) (explaining the distinction). Personal injuries counted as transitory torts and could be tried anywhere in the realm. Trespasses to land and other real-property suits were local and had to be heard in the venue where the property was located. See *id.* at 248.

Through the transitory torts doctrine, the common law also recognized a court's ability to hear transitory tort cases arising in the land of a foreign sovereign. In *Mostyn v. Fabrigas*, 1 Cowp. 161, 177 (1774), Lord Mansfield observed that "all actions of a transitory nature that arise abroad may be laid as happening in an English county." Our Supreme Court has long recognized this principle, dating back to *McKenna* in 1843, 42 U.S. (1 How.) at 249 ("the courts in England have been open in cases of trespass other than trespass upon real property … for trespasses committed within the realm and out of the realm"), and continuing through *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 118 (2013) (explaining why the transitory torts doctrine, a creature of the common law, does not apply to the Alien Tort Statute); see generally 14D Charles Alan Wright & Arthur R. Miller, et al., Federal Practice and Procedure § 3822 (4th ed. 2013) (discussing doctrine and 2011 amendment to 28 U.S.C. § 1391(a) abolishing local/transitory distinction for federal civil venue).

We see nothing in Supreme Court precedent or in the railroad statutes themselves suggesting congressional intent to abolish the ability of state courts to hear tort cases arising

from injuries in foreign jurisdictions. Instead, the transitory torts doctrine directs courts to take care in adjudicating transitory torts cases to ensure that they apply the appropriate standard of care. To the extent the issue has been raised, the Court's opinion in *Chisholm* assumes the doctrine's continued viability. And "trespass to the person" was "always held to be transitory." *Dennick*, 103 U.S. at 18.

B. *Choice of Law*

Although the Supreme Court adopted *lex loci delicti* as the law governing railroad accidents outside the nation's borders in *Chisholm* and *Slater*, that rule did not survive the sea change in federal courts' application of general common law wrought by *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), and *Klaxon Co. v. Stentor Manufacturing. Co., Inc.*, 313 U.S. 487 (1941), which applied *Erie* to choice-of-law issues. As a pre-*Erie* decision, *Slater* makes sense as an adoption of the *lex loci delicti* rule as a matter of general common law in the federal courts. Since *Erie* was decided in 1938, however, federal courts cannot apply general common law principles as federal common law. Instead, federal courts must apply the applicable state common law, except in narrow circumstances not applicable here. See *Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981) (describing the few exceptions for federal common law).

In *Klaxon*, the Supreme Court held that *Erie* "extends to the field of conflict of laws" so that a federal district court must apply the choice-of-law rules of the forum state in which it sits. 313 U.S. at 496. In the intervening decades, the common law has evolved in many states, including Indiana, to recognize that in some tort cases, the law of the place of injury does not apply. *Hubbard Mfg. Co. v. Greeson*, 515 N.E.2d 1071, 1074

(Ind. 1987), adopting Restatement (Second) of Conflicts of Laws § 145(1) (Am. Law. Inst. 1971) (endorsing most-significant-relationship approach to choice of law in tort cases).

We need not worry further here about a choice among the laws of Indiana, Ontario, or any other jurisdiction. The choice-of-law issue is waived if a party fails to raise it. *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014). That is surely the case here because neither side has argued that Canadian law applies. Both sides in this case instead battled over whether the LIA preempts Ward's claims under Indiana's common law. As we have explained, the LIA preempts the state's common-law standards of care, but not the state's cause of action for damages resulting from violations of federal policy.

In short, where the FELA does not apply and Congress has provided no independent private right to sue for LIA violations in federal court, the states may still borrow the federal standard of care from the LIA so "that violations of federal law can be redressed through state common-law claims." *Delaware & Hudson*, 781 F.3d at 662. Allowing such claims applying uniform federal standards of care does not threaten railroads with conflicting standards of care, and certainly not any more than does the FELA, under which state courts apply the standards of the LIA and its regulations. See *id*. at 666 & n.16.

C. *Waiver*

1. *District Court*

The defendants argue that even if they are wrong about the scope of LIA preemption, they should still prevail because the plaintiff waived in the district court all of his claims other than state-law failure-to-warn claims that are clearly

preempted under *Kurns*. The defendants argue that plaintiff
waived the (viable) claims under state law based on violations
of the LIA and its regulations by failing to repeat, in his re-
sponse to a second motion to dismiss, valid arguments that
the district court had already definitively rejected in granting
the first motion to dismiss. This waiver argument, which was
accepted by the district court, is contrary to our precedent. If
we accepted this argument, we would require plaintiffs to re-
peat at each later stage of litigation arguments and claims that
the district court had already rejected at earlier stages. This
would impose an unnecessary and annoying burden on par-
ties and district courts. To explain why plaintiff Ward did not
waive his viable claim in the district court, we need to trace in
some detail the procedural path his case took in the district
court.

After his injury, Ward filed two lawsuits. In the first, he
sued Soo Line in federal court in Indiana asserting FELA and
common-law negligence claims. See Dkt. 28. In the second, he
sued Soo Line, General Electric, and other defendants in state
court in Illinois for negligence and strict product liability. See
Dkt. 44-1. Soo Line removed that suit to federal court, where
it was transferred to the Northern District of Indiana and con-
solidated with Ward's first suit. Prior to the consolidation, the
district court dismissed Ward's FELA claims because the stat-
ute has no extraterritorial effect, leaving only the negligence
claim in the first complaint against Soo Line.

General Electric and the other manufacturer defendants
moved for summary judgment on all claims against them, as-
serting that the LIA preempted state-law tort claims. With this
motion pending, Ward moved to amend his state-law claims
against all defendants to clarify that he pursued state-law

causes of action for violations of federal standards of care mandated by the LIA. Dkt. 51. Ward's motion provided exactly the right reasoning and correctly cited the Third Circuit's *Delaware & Hudson Railway Co. v. Knoedler Manufacturers*, 781 F.3d 656 (3d Cir. 2015), which explains why this theory should offer Ward a path to relief. The magistrate judge denied this motion to amend but said that Ward could make this same argument in response to the pending motion to dismiss. Ward followed this advice in his response to the defendants' motion to dismiss, asserting that his "claim in the instant case is effectively premised on a violation of the duties and standards of care stemming from the LIA itself." Dkt. 65 at 11. He again cited the Third Circuit's decision in *Delaware & Hudson*. The district court rejected this argument and dismissed all claims against General Electric and the other manufacturer defendants, leaving only the state-law causes of action against Soo Line pending.

After the court issued this erroneous ruling, Soo Line moved for judgment on the pleadings for the remaining negligence counts against it based solely on the district court's prior ruling for the manufacturer defendants. In response to this motion, Ward sought to draw the court's attention to his failure-to-warn claim against the railroad by emphasizing deposition testimony from the engineer who operated the train prior to Ward. He had noticed the seat was loose but did not alert Ward. Dkt. 105-1 at 2. Having already failed to convince the district court that he could use a state-law cause of action to vindicate federal standards of care under the LIA, Ward pivoted away from his previous argument. He argued then that the LIA "preempts state law claims as to design, construction, maintenance, [and] installation of locomotive seats" but "does not preempt state law claims for failure to warn an

employee of a dangerous, unsafe condition of an engineer's seat." *Id.* at 1.

That argument was wrong on the merits of preemption for reasons we have already explained. But the district court took this statement to mean that Ward "concedes that the LIA preempts state law claims" and rejected his contention that the failure-to-warn claim could survive LIA preemption. *Ward v. Soo Line Railroad Co.*, 2017 WL 1836900, at *5 (N.D. Ind. May 8, 2017). On appeal, the defendants use this statement of the district court to argue that Ward conceded entirely his general negligence claims against the defendant and preserved for appellate review only the doomed (because preempted) failure-to-warn claims that were his response to the second motion for dismissal. The defendants were right about the lack of merit of those claims, but not about the supposed waiver of Ward's viable theory in the district court.

"[A] definitive ruling *in limine* preserves an issue for appellate review, without the need for later objection." *Wilson v. Williams*, 182 F.3d 562, 563 (7th Cir. 1999) (en banc). The district court ruled definitively against Ward's viable theory for recovering under state tort law, borrowing the standard of care from the federal LIA and its regulations. To preserve his right to appeal that error, Ward and his lawyers were not required to keep fighting that fight in the district court. They were entitled to try other theories. They did, and those have come to naught, but at that point, they were still entitled to pursue on appeal the viable theory they raised in the district court.

We see little value in requiring plaintiffs and their lawyers to replead and reargue at later steps in the litigation claims or

arguments that the district court has already definitively rejected. See *Buechel v. United States*, 746 F.3d 753, 763 (7th Cir. 2014) (plaintiff "did not need to replead a claim that was properly pled"). "It is not waiver—it is prudence and economy—for parties not to reassert a position that the trial judge has rejected." *Bastian v. Petren Resources Corp.*, 892 F.2d 680, 683 (7th Cir. 1990). Requiring the continual repetition of spurned arguments would not be useful. If Ward had asserted his state tort law claim again, the district judge likely "would have dismissed the charge, not only with prejudice but with annoyance." *Id.*; see *Wilson*, 182 F.3d at 566 (observing that raising a question the court already decided "may annoy the judge"). Lawyers and clients need not pursue the persistent strategies of rebuffed suitors in Victorian courtship novels. Once rejected, counsel should be able to turn their attention to alternative arguments without fear that appellate courts might apply a harsh waiver rule against them.[3]

---

[3] See also *Knight v. Poritz*, 157 Fed. App'x 481, 487 n.3 (3d Cir. 2005) (finding plaintiff's argument "preserved" despite "failure to expressly counter the defense in the second motion to dismiss" because plaintiff's "earlier pleadings raised the argument" in district court proceedings); *Indep. Asset Mgmt. LLC v. Zanger*, 538 F. Supp. 2d 704, 709 n.3 (S.D.N.Y. 2008) (declining to treat plaintiff's argument in response "to the second motion to dismiss as waived" because defendant "made the same basic arguments . . . in both its first and second motions, and [plaintiff] clearly responded to the first motion.").

Note that the rule is different for *denials* of motions to dismiss or motions for summary judgment. Such denials are not final and definitive, and a defendant who seeks to pursue a defense rejected in such a denial must renew it at later stages, such as through a Rule 50 motion at trial. See *Ortiz v. Jordan*, 562 U.S. 180, 184 (2011); *Empress Casino Joliet Corp. v. Balmoral*

2. *Waiver on Appeal*

Ward preserved his viable claims in the district court, but what about on appeal? With new counsel on appeal, his opening brief to this court spent too much time pursuing a frivolous constitutional argument that he had been denied access to the courts. We reject this argument completely. But the decisive problem is that Ward did not press on appeal his *Delaware & Hudson* argument for avoiding LIA preemption by borrowing the LIA standard of care. He pursued only an argument that the defendants failed to provide adequate warnings of the defective seat. In oral argument, counsel for Ward made clear, repeatedly, that the only live claims on appeal are those for failure to warn. Those claims are plainly preempted under *Kurns* for reasons we explained above.

In his appellate brief, Ward cited *Rogers v. Consolidated Rail Corp.*, 948 F.2d 858 (2d Cir. 1991), *aff'g* 688 F. Supp. 835 (N.D.N.Y. 1988), and *Priestman v. Canadian Pacific, Ltd.*, 782 F. Supp. 681 (D. Maine 1992), which both allowed railroad workers injured in Canada to pursue remedies under state law. Neither case addressed LIA preemption, however, and neither adopted or hinted at the reasoning that could provide Ward with a viable path to recovery. His reliance on those cases therefore did not work as a backhand way of raising and arguing his one viable path to recovery under the reasoning of *Delaware & Hudson*, using federal law to supply the standard of care under state common law. See, e.g., *Argyropoulos v. City of Alton*, 539 F.3d 724, 739 (7th Cir. 2008) (finding waiver of particular argument where brief did not develop argument

---

*Racing Club, Inc.*, 831 F.3d 815, 823–24 (7th Cir. 2016) ("After trial, the summary judgment denial [wa]s ancient history and not subject to appeal.").

and counsel waived it in oral argument); *Duncan v. State of Wisconsin Dep't of Health & Family Services*, 166 F.3d 930, 934–35 (7th Cir. 1999) (party waived arguments not developed in appellate brief); see also Fed. R. App. P 28(a)(8).

Since plaintiff Ward waived on appeal the only viable theory for pursuing relief from these defendants, we cannot revive it for him. The judgment of the district court is

AFFIRMED.